639 F.2d 516
 67 A.L.R.Fed. 819, Fed. Sec. L. Rep. P 97,871
 William R. WHITTAKER, on behalf of himself, and executor of
the estate of Beulah Whittaker, Plaintiff-Appellee,
v.
WHITTAKER CORPORATION, a California Corporation,
Defendant-Appellant.
William R. WHITTAKER, on behalf of himself, and executor of
the estate of Beulah Whittaker, Plaintiff-Appellant,
v.
WHITTAKER CORPORATION, a California Corporation, Defendant-Appellee.
 Nos. 77-2297, 77-2550.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 4, 1979.
Decided Feb. 12, 1981.
 
 Robert E. Cooper, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant-appellant; Martin C. Washton, Los Angeles, Cal., on brief.
 William T. Bisset, Hughes, Hubbard & Reed, Los Angeles, Cal., for plaintiff-appellee; William H. Levit, Jr., Los Angeles, Cal., on brief.
 Appeal from the United States District Court for the Central District of California.
 Before CHAMBERS and TANG, Circuit Judges, and ORRICK,* District Judge.
 TANG, Circuit Judge:
 
 
 1
 This case involves liability under the insider short-swing trading provisions of the Securities Exchange Act of 1934, § 16, 15 U.S.C. § 78p. The principal questions presented are whether shares nominally owned by another may be attributed to an insider for liability under § 16(b) and whether the two-year limitations period of § 16(b) may be tolled. On demand by the Whittaker Corporation (Corporation), the putative insider, William Whittaker (William), paid the amount of alleged profits from insider transactions between December 1, 1965 and December 31, 1970 (the relevant trading period). He later sought a declaratory judgment of nonliability under § 16(b) and return of the monies previously paid. The district court found William liable but also found that the statute of limitations of § 16(b) operated to cut off liability for transactions prior to January 29, 1969. We affirm the district court on the issue of William's liability, but we reverse and remand on the limitations issue.
 
 PRELIMINARY BACKGROUND
 
 2
 The Whittaker Corporation is a corporation in which William Whittaker and his mother, Beulah Whittaker, owned substantial percentages of stock. William was a director and Chairman of the Board of Directors during the relevant trading period. In 1965, because of amendments broadening § 16, the Corporation became subject to § 16 of the Securities Exchange Act of 1934, 15 U.S.C. § 78p (hereinafter § 16).
 
 
 3
 Briefly, § 16(a) requires "insiders" any person who is a 10% beneficial owner of a company whose securities are registered under the Act or a director or an officer of the company to file monthly reports with the Securities and Exchange Commission (SEC) showing any changes in the person's ownership in the company. Section 16(b) declares that any profits which such person may realize by any purchase and sale of the company's securities within six months shall inure to and be recoverable by the company. Suits to recover such profits may be brought by the company or by any shareholder in a derivative suit if the company fails to do so. No such suit shall be brought more than two years after the date such profit was realized.
 
 
 4
 Since 1959 William had power of attorney from his mother Beulah to conduct business matters for her. The securities transactions involved in this case took place between December 1, 1965 and December 31, 1970. William purchased Whittaker Corporation common stock and convertible debentures for his mother's account, and within six months of such purchases, sold common stock for his own account and convertible debentures and common stock for his mother's account. None of the transactions involving securities for his mother's account were reported to the SEC as required by § 16(a). The district court determined that, because of the relationship between William and his mother, the control William had over her stock, and the benefits he realized from it, he must be deemed the beneficial owner of his mother's stock, and so should have reported the transactions under § 16(a) and was liable to the corporation under § 16(b) for profits derived from those transactions involving his mother's stock which he realized by a purchase and sale of the Corporation's securities within six months.
 
 
 5
 The Corporation asserts it did not learn of the full extent of William's total control over his mother's shares until the fall of 1970. It then compiled a list of all William's transactions in the securities of the Corporation, determined which were six-month short-swing insider trades, and computed the profit realized by William. In January 1971, the Corporation demanded payment of these realized profits plus interest.
 
 
 6
 On January 29, 1971, William paid the amount demanded, denied liability and reserved the right to bring an action to determine his liability and to seek return of the monies. William remained with the Corporation as President until November 1974 and as Chairman of the Board until January 31, 1975. On July 29, 1975, William and his mother commenced this action for a declaration of nonliability under § 16 and recovery of the money.
 
 
 7
 Trial was held before the court without a jury. The district court found that William was liable as an insider for the transactions in his mother's shares, but that the statute of limitations of § 16(b) barred recovery for all but one year of the relevant trading period. That is, only profits on transactions within two years prior to the Corporation's demand in January 1971 could be recovered. On the transactions for which the Corporation could recover, the district court computed profits realized according to the rule of "lowest price in, highest price out" within six months and awarded the Corporation pre-judgment interest. The Corporation was then ordered to pay back the balance of the money paid in 1971.
 
 ISSUES ON APPEAL
 
 8
 1. Was the Corporation's notice of appeal filed timely? (Raised by William on motion to dismiss)
 
 
 9
 2. Was William the beneficial owner of his mother's shares, so that profits realized in his transactions in those shares were "profits realized by him" for § 16(b) liability? (Raised by William on cross-appeal)
 
 
 10
 3. How should the two-year limitations period of § 16(b) be construed? (Raised by the Corporation on appeal)
 
 
 11
 4. Is the "highest sales price, lowest purchase price" method for computing profits in insider trading the correct method? (Raised by William on cross-appeal)
 
 
 12
 5. Was the award of prejudgment interest on the amount of profits recovered by the Corporation incorrectly decided by the district court? (Raised by William on cross-appeal)
 
 I.
 NOTICE OF APPEAL
 
 13
 William has moved to dismiss the Corporation's appeal on the ground that the notice of appeal was not timely filed. The judgment of the district court was entered on April 7, 1977. The judgment included the award of costs to the plaintiffs, William and Beulah Whittaker, as the prevailing party. On April 14, 1977 defendant Corporation moved to retax costs, specifically that all parties "bear their own taxable costs pending appeal of this action." The Corporation argued that it, not the plaintiffs, should be considered the prevailing party. The motion to retax costs was denied on April 20, 1977. Having learned that William would oppose any filing of a notice of appeal as untimely on the ground that the 30-day period for filing under Fed.R.App.P. 4(a) had begun on April 7, 1977 and so had expired, the Corporation moved the district court for either 1) a determination that the motion to retax costs had extended the time for filing a notice of appeal since it was a Fed.R.Civ.P. 59(e) motion to alter or amend the judgment or 2) an extension of time for filing the notice of appeal by reason of "excusable neglect" in learning of the date of entry of judgment. The district judge rejected the excusable neglect contention but agreed the motion was a Rule 59(e) motion, even though it was denied. He ordered the Corporation's notice of appeal accepted for filing. It was filed May 18, 1977.
 
 
 14
 Failure to file a timely notice of appeal is jurisdictional; and the Court of Appeals would lack jurisdiction to review the judgment. Browder v. Director, Department of Corrections, 434 U.S. 257, 264, 98 S.Ct. 556, 561, 54 L.Ed.2d 521 (1978); Rodriguez v. Southern Pacific Transportation Co., 587 F.2d 980, 981 (9th Cir. 1978); Alexander v. Sacha, 439 F.2d 742 (9th Cir. 1971). The notice of appeal must be filed within 30 days of the entry of judgment. Fed.R.App.P. 4(a). But the running of this time is terminated by a timely filed motion under, inter alia, Fed.R.Civ.P. 59(e) (motion to alter or amend the judgment), and the 30-day time commences anew from the date such motion is decided. The Corporation's motion was filed within the 10-day time limit for Rule 59(e) motions. Its notice of appeal was filed more than 30 days from the entry of judgment, but less than 30 days from the district court's denial of its motion to retax costs. The issue then is whether the Corporation's motion is a 59(e) motion (which extends the time for appeal) or a Rule 54(d) motion which reviews the Clerk's actions regarding costs (which does not extend the time for appeal).
 
 
 15
 The Corporation styled its motion a motion to retax costs and did not recite that it was proceeding under Rule 59(e). "But nomenclature is not controlling." What is required is that the requested relief be "relief which might have been granted under Fed.R.Civ.P. 59(e)." Sea Ranch Ass'n v. California Coastal Zone Conservation Comm'n, 537 F.2d 1058, 1061 (9th Cir. 1976). Accord Mir v. Fosburg, Slip Op., at 1707, 646 F.2d 342, at 344 (9th Cir. 1980).
 
 
 16
 A motion to amend the judgment with respect to costs has been heard as a 59(e) motion where the motion was to tax costs against a different party, United States v. Crawford, 36 F.R.D. 174 (W.D.La.1964); or to delete the award of costs altogether, United States v. 2,186.63 Acres of Land, 464 F.2d 676, 677 (10th Cir. 1972); or to add costs where none were in the judgment before, see Alameda v. Paraffine Companies, Inc., 169 F.2d 408, 409 (9th Cir. 1948) (prior to Rule 59(e), treating such motion as amending judgment so as to extend time for filing notice of appeal).[1]
 
 
 17
 On the other hand, Rule 54(d) motions are appropriate for correcting clerical errors in the bill of costs, disputing particular items or amounts, or otherwise amending an accepted award of costs. For substantive challenges as to the appropriateness of awarding costs at all, especially where such challenge involves a redetermination of who was the prevailing party, Rule 59(e) may be appropriate. We do not mean to imply that these categories are exclusive. It may be that some motions could be characterized as under both Rules 54(d) and 59(e) motion.
 
 
 18
 William relies on Environmental Defense Fund, Inc. v. Froehlke, 368 F.Supp. 231 (W.D.Mo.1973), aff'd, 497 F.2d 1340 (8th Cir. 1974). But in Froehlke the district judge found that the plaintiffs actually were seeking only a review of amount of costs and a determination of which costs were taxable to plaintiffs. 368 F.Supp. at 252-53. Moreover, the court appears to have been led to treat the motion as a 54(d) motion so as to reach the merits and avoid the untimeliness problem created if it were treated as a 59(e).[2]
 
 
 19
 The Corporation's motion here was not a motion challenging any item of cost or amount of any item as assessed by the Clerk. Rather, it was a challenge as to who should be entitled to costs, that is, a question of who the prevailing party was. As the district judge recognized, because of the unusual procedural circumstances of this case, the roles of plaintiff and defendant were, in effect, reversed. Normally, the corporation would be the plaintiff, suing to recover the insider profit. Although William was technically the prevailing party since he won a money judgment, the Corporation had prevailed on the gravamen of its claim. If the suit had been a normal insider trading case, the Corporation would have "prevailed." Thus, the Corporation's motion went to the heart of how the judgment was to be characterized. The district judge is surely in a position to understand the ramifications of the motion on the judgment. Cf. In re Estate of Butler's Tire & Battery Co., Inc., 592 F.2d 1028, 1032 (9th Cir. 1979) (district court's extension of time for appeal for excusable neglect under Fed.R.App.P. 4(a) overturned only for abuse of discretion). He thought the relief requested, if granted, "would have necessarily resulted in an amendment of that judgment."[3]
 
 
 20
 We agree and consider the Corporation's motion correctly construed as a Rule 59(e) motion. Since it was timely filed, it extended the time for filing the notice of appeal under Fed.R.App.P. 4(a). The Corporation's appeal is timely.
 
 II.
 BENEFICIAL OWNERSHIP AND PROFIT REALIZED
 A. General Principles for § 16
 
 21
 Section 16(b) declares, in effect, that directors, officers, and 10% beneficial owners are presumed to have inside information and then states the corporation can recover any profits made by these insiders on transactions within a six-month period. This recovery rule is virtually automatic. Neither actual possession of inside information nor use of such information need be shown. Even initial good faith intent to hold the securities for longer than six months is no defense. "In short, this statute imposes liability without fault within its narrowly drawn limits." Foremost-McKesson, Inc. v. Provident Securities Co., 423 U.S. 232 at 251, 96 S.Ct. 508 at 519, 46 L.Ed.2d 464. However, "it is an objective rule and does not reach every transaction in which an investor actually relies on inside information, or in which the potential for such reliance is great." Lewis v. Varnes, 505 F.2d 785, 787 (2d Cir. 1974). See Blau v. Max Factor & Co., 342 F.2d 304, 307 (9th Cir.), cert. denied, 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965); Rheem Mfg. Co. v. Rheem, 295 F.2d 473, 475 (9th Cir. 1961). See generally 2 L. Loss, Securities Regulation (2d ed. 1961) at 1040-44.
 
 
 22
 In interpreting § 16 for situations which do not fall obviously within its scope, a certain tension is immanent. On the one hand, "where alternative constructions of the terms of § 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders." Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418 at 424, 92 S.Ct. 596 at 600, 30 L.Ed.2d 575. This "objective approach" goes back to the earliest cases interpreting the statute. "The statute is broadly remedial.... (I)t was intended to be thoroughgoing, to squeeze all possible profits out of stock transactions, and thus to establish a standard so high as to prevent any conflict between the selfish interest of (an insider) and the faithful performance of his duty." Smolowe v. Delendo Corp., 136 F.2d 231, 239 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 46, 88 L.Ed. 446 (1943). See also Adler v. Klawans, 267 F.2d 840, 846 (2d Cir. 1959) (§ 16 to be interpreted broadly so as to give full effect to plain congressional intent).
 
 
 23
 On the other hand, because of the mechanical application of § 16(b), imposing liability without fault on transactions within its scope, courts more recently have been hesitant to bring borderline transactions under that scope by interpretation where congressional intent was unclear and the transaction in question was not of a type giving rise to speculative abuse. See, e. g., Foremost-McKesson, Inc., 423 U.S. at 252, 96 S.Ct. at 520 (person must be 10% owner prior to purchase at issue); Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582 at 593-95, 93 S.Ct. 1736 at 1744-1745, 36 L.Ed.2d 503 (sales in context of blocked tender offer); Reliance Electric Co., 404 U.S. at 424 n. 4, 92 S.Ct. at 600 n. 4 (person must be 10% owner at time of sale at issue); Blau v. Max Factor & Co., 342 F.2d at 306-09; Lewis v. Varnes, 505 F.2d at 789; Matas v. Siess, 467 F.Supp. 217, 220-21, 224 (S.D.N.Y.1979).
 
 
 24
 Under this "subjective" or "pragmatic" approach, courts inquire whether the transaction involved carries a potential for insider abuse. Only those types of transactions which do are then found included within the statutory scope. Kern County Land Co., 411 U.S. at 594-95, 93 S.Ct. at 1744-1745. However, the pragmatic approach has not ousted the objective view. Rather, the pragmatic approach is used to determine the boundaries of the statute's definitional scope in borderline situations, especially unorthodox transactions. Id. For a garden-variety transaction which cannot be regarded as unorthodox, the pragmatic approach is not applicable. Mouldings, Inc. v. Potter, 465 F.2d 1101, 1104-05 (5th Cir. 1972), cert. denied, 410 U.S. 929, 93 S.Ct. 1368, 35 L.Ed.2d 591 (1973); Tyco Laboratories, Inc. v. Cutler-Hammer, Inc., 490 F.Supp. 1, 7 (S.D.N.Y.1980); Matas v. Siess, 467 F.Supp. at 220. In such cases, if the situation is within the requirements established by Congress for § 16, then the mechanical, "objective," operation of the statute imposes liability.
 
 
 25
 B. The Question Presented and Factual Background
 
 
 26
 Under § 16(b), the corporation may recover "any profit realized by him (the insider)" in covered short-swing transactions. In the present case, the securities in question were in William's mother's name and the profits realized in their trading went into her accounts. Thus, the question arises whether these profits[4] were profits "realized by him " and so recoverable or were realized only by his mother and so not covered by § 16(b). William, relying on the narrow interpretive approach discussed above, argues that the term "by him" should be read strictly and narrowly and that, so read, it does not include the profits here. The Corporation and the district court below, however, use the concept of "beneficial ownership" in § 16(a) in order to give content to the term "realized by him" in § 16(b). Under that analysis William was found liable under § 16(b).
 
 
 27
 William raises his issues on cross-appeal as pure questions of law; he disputes none of the fact findings below. Accordingly, we accept and rely on the facts as found by the district court. In any event, the district court's findings of fact as to these issues are not clearly erroneous under Fed.R.Civ.P. 52(a). Pertaining to the ownership issue, the district court found the following.[5] In 1959, because of her advancing age, his mother granted William a broad general power of attorney, giving him the right to pay her bills, sign checks for her, manage her financial and business affairs, and purchase and sell securities for her investments. In 1969, this power was renewed. "At all times relevant to this litigation, Mr. Whittaker made and executed virtually all investment and business decisions for his mother on his own initiative and in his sole discretion pursuant to this power of attorney."
 
 
 28
 A joint bank checking account, bearing Beulah's and William's names, was set up for her expenses. From 1960 and throughout the relevant trading period, William maintained and personally signed all checks drawn on this joint account. During the same period, Beulah's income was deposited to this account and her expenses paid from it.
 
 
 29
 The district judge further found that "it is clear that Mr. Whittaker exercised virtually complete control over his mother's affairs ...." Throughout the relevant trading period, William received a series of substantial loans from his mother. His control over her finances enabled William "to freely borrow large sums of money from her while never having to consider paying the money back, posting adequate security or even paying any interest that might accrue." Moreover, William used his mother's assets to fund, through interest-free loans, advantageous investment opportunities he otherwise might have had to forego. William would borrow from a bank in his mother's name, and the interest would be paid from her funds.
 
 
 30
 As the district judge summarized, "(i)n short, the evidence indicates that Mr. Whittaker felt free to utilize his mother's assets exactly as if they were his own. It is thus obvious that Mr. Whittaker stood to gain on any profits he might make for his mother through the purchase and sale of Whittaker Corporation securities."[6]
 
 
 31
 C. "Profit realized by him"
 
 
 32
 On this factual basis, the district court concluded that William was the "beneficial owner" of the securities under the definition of beneficial owner developed for § 16(a). Insiders must include in their reports required under § 16(a) those securities of which they are the "beneficial owner." See SEC Securities Exchange Act Release No. 7793 (Jan. 19, 1966) (discussed at page 526 infra). Under the applicable principles William was the beneficial owner and should have included them in his § 16(a) reports. This determination is uncontested. The district court then held that, if one is the beneficial owner, the securities are "his," and thus one must be chargeable with the profits under § 16(b), relying on Whiting v. Dow Chemical Co., 523 F.2d 680 (2d Cir. 1975), aff'g, 386 F.Supp. 1130 (S.D.N.Y.1974), and on Altamil Corp. v. Pryor, 405 F.Supp. 1222 (S.D.Ind.1975).
 
 
 33
 William contends the district court was in error because Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), requires a narrow reading of "profits realized by him" in § 16(b) and particularly because the equation of "beneficial ownership" for § 16(a) reports with profit attribution for § 16(b) liability is erroneous as a matter of law. We reject William's contentions and affirm the district court on this issue. Our affirmance rests on two distinct grounds.
 
 
 34
 First, quite apart from any consideration of beneficial ownership, we hold that on the facts as found by the district court the profits are profits realized by William under § 16(b). William controlled his mother's investments. He thus controlled the trading in Corporation securities. He determined the timing and amount of sales and purchases. William had control over his mother's assets and so had control over money received for the Corporation securities. He could use those assets as freely as if they were his own. And in fact he did so use them, in large amounts, on several occasions. On these facts control over the securities and unfettered ability to use the money for his own benefit any reasonable interpretation of "profit realized by him" must encompass the instant case. Cf. Mouldings, Inc. v. Potter, 465 F.2d at 1103-05 (insider designated others to whom profits would go, profits held attributable to insider for § 16(b) liability).
 
 
 35
 Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), on which William relies principally, does not require a different result. In Lehman, Blau, a shareholder in Tide Water, brought a § 16(b) claim against Lehman Brothers, an investment banking house, and Thomas, a partner in Lehman Brothers and a director of Tide Water. While Thomas was a director of Tide Water, Lehman Brothers had engaged in short-swing trading of Tide Water stock for its own account and realized profits thereon. The Supreme Court held that all the Lehman Brothers profits were not profits realized by Thomas personally and so Thomas was not liable for them under § 16(b). 368 U.S. at 413-14, 82 S.Ct. at 456-457.
 
 
 36
 William argues that, just as the Lehman profits were not attributable to Thomas, so his mother's profits are not attributable to him. William's reliance is misplaced. Lehman is clearly distinguishable. One partner in an investment firm has neither the same control over trading nor the same benefit from profits in the firm's portfolio that William had over his mother's securities. Indeed, several of the facts in Lehman underscore this distinction. Lehman Brothers purchased the Tide Water securities without consulting Thomas, and, once the purchases were discovered, Thomas was insulated from financial interest in them. See 368 U.S. at 406, 82 S.Ct. at 453. While it may have been "nothing but a fiction to say that Thomas 'realized' all the profits earned by the partnership of which he was a member," 368 U.S. at 414, 82 S.Ct. at 457, it would be an equal fiction here to say these profits are not William's.[7]D. "Beneficial ownership" and "profit realized"
 
 
 37
 Our second rationale for affirmance involves consideration of the interrelationship between beneficial ownership in § 16(a) and profits realized by him in § 16(b). While we agree with the district court's result and also agree that there is a strong relationship between these provisions of § 16(a) and § 16(b), we do not agree that there is always an automatic equivalence between the two.
 
 
 38
 The intent and purpose of § 16 must be gleaned from the statute as a whole rather than from its isolated parts. Adler v. Klawans, 267 F.2d 840, 844 (2d Cir. 1959). Sections 16(a) and 16(b) must also be read together because they are grammatically related. See American Standard, Inc. v. Crane Co., 510 F.2d 1043, 1058 (2d Cir. 1974), cert. denied, 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975). In particular, the scope and definition of insider or beneficial owner for § 16(b) has been determined by reference to § 16(a). See Foremost-McKesson, Inc., 423 U.S. at 234 n.1, 96 S.Ct. at 511 n.1; Kern County Land Co., 411 U.S. at 591 n.21, 93 S.Ct. at 1743 n.21; Reliance Electric Co., 404 U.S. at 419 n.1, 92 S.Ct. at 597 n.1 (second paragraph). Under § 16(a), an insider is required to report changes in ownership of covered securities "of which he is the beneficial owner." Thus, for reporting purposes, stock ownership is attributed to directors and officers (as well as to principal 10% shareholders) by the concept of beneficial ownership. Moreover, the identity of some insiders (i. e., those who are insiders by virtue of 10% beneficial ownership) for § 16(b) liability is determined by reference to § 16(a). Thus, it is not far-fetched similarly to determine by reference to § 16(a) what stock those insiders own for § 16(b) liability.
 
 
 39
 The Second Circuit adopted this approach in a similar situation. In Whiting v. Dow Chemical Co., 523 F.2d 680 (2d Cir. 1975), aff'g 386 F.Supp. 1130 (S.D.N.Y.1974), the court determined that a spouse's shares were beneficially owned by the insider and that once the insider is the " 'beneficial owner,' he must be chargeable with all the profits or none." Whiting, 523 F.2d at 689. In Whiting the shares were owned by the non-insider wife, and she had predominant control over them. However, analyzing all the facts, the court determined that the transactions were part of a jointly managed common investment plan, that the income was available to both spouses, and in particular that the proceeds of the sale of the wife's shares had been used to finance the husband's purchases. The court then concluded these facts made the husband the beneficial owner of these stocks under the SEC's definition of beneficial ownership. See SEC Securities Exchange Act Release No. 7793 (Jan. 19, 1966) ("Release 7793").[8]
 
 
 40
 Essentially, under Release 7793, a person is a beneficial owner of shares held in another's name if the person either obtains benefits substantially equivalent to ownership or has the power to revest title in himself. However, Release 7793 defined beneficial ownership only for purposes of the § 16(a) reporting requirement. A subsequent SEC Release made it clear that the requirement to report beneficially owned shares was not coextensive with § 16(b) liability. SEC Securities Exchange Act Release No. 7824 (Feb. 14, 1966), reprinted in CCH Fed.Sec.L.Rep. P 26,030 ("Release 7824"). Rather, liability under § 16(b) for transactions in beneficially owned shares is "to be determined by the facts of each particular case in an appropriate action brought by the issuer or its security holders." Release 7824. Under Release 7793, "a person ordinarily should include in his (§ 16(a) reports) securities held in the name of a spouse or minor children as being beneficially owned by him." It is this routine, automatic ("ordinarily") quality of § 16(a) reporting that makes the mere presence of a § 16(a) reporting requirement, without more, unsuitable as a conclusive determinant of § 16(b) liability.
 
 
 41
 The Whiting court recognized this limitation on § 16(a) beneficial ownership, 523 F.2d at 687, and further recognized the underlying reason for it namely, that "(a) definition of 'beneficial ownership' may be broad enough to require reporting for purposes of public exposure but too broad for the imposition of liability under § 16(b)." 523 F.2d at 685 n.8. But, the Whiting court still ended with a general proposition that, if one is the "beneficial owner," one is chargeable with the profits. 523 F.2d at 689. The Whiting court apparently created an unexpressed new term, "beneficial ownership for § 16(b) purposes." The court then took the defining characteristics of beneficial ownership in Release 7793 and applied them to the facts of the particular case, as Release 7824 advised. This application was done not simply to find if beneficial ownership for § 16(a) reporting was met, but to determine if the actual rewards of ownership were sufficiently present to warrant attributing the stock to the insider-spouse for § 16(b) liability. See 523 F.2d at 688-89. See also 386 F.Supp. 1130, 1136-38 (district court in Whiting). It was this "beneficial ownership for § 16(b)" which was dispositive in determining what profits were "realized by him."
 
 
 42
 The district court below, relying on Whiting, engaged in a similar reasoning. Analyzing the facts of William's control and benefit over the shares, the court concluded he "must be deemed the beneficial owner of (his mother's) securities for purposes of § 16(b)."
 
 
 43
 William argues the Whiting analysis equates § 16(a) reporting and § 16(b) liability and that such an equation unduly expands § 16(b). While the Whiting analysis is somewhat ambiguous, we do not read that case as making such an equation. Rather, the Whiting court engaged in a factual determination of beneficial ownership specifically for purposes of § 16(b). Nor, in following Whiting, did the district court in the case at bar make such an equation. The district court did not rely on the mere fact that his mother's shares were beneficially owned by William for § 16(a) reports. The court took evidence on the relation between his mother and William, the extent of William's involvement in managing her affairs, and particularly the degree of control William had over the Corporation securities, and the extent of his ability to enjoy the benefit therefrom. Only after evaluating this evidence did the district court conclude that his mother's securities should be attributed to William in computing his profits realized under § 16(b).
 
 
 44
 In affirming the district court finding, we hold that an insider who trades in shares which he or she beneficially owns within the meaning of § 16(a) may be subject to the sanctions of § 16(b). Such liability should be imposed, however, only following a determination by the trial court not simply that the requirements of beneficial ownership were met for purposes of the § 16(a) reporting requirement, but that actual rewards of ownership were sufficiently present to warrant attributing the stock to the insider for purposes of § 16(b). In making this determination, the court should especially consider as key factors the degree to which the insider exercised control over the securities and the insider's ability to use the profits made. See Note, "Beneficial Ownership" Under § 16(b) of the Securities Exchange Act of 1934, 77 Colum.L.Rev. 446, 460-62 (1977).
 
 
 45
 William also contends that this analysis, like the Whiting court's, run contrary to the strict interpretive approach of the Supreme Court in Foremost-McKesson, Inc., Kern County Land Co., and Reliance Electric Co. Our reading of § 16(b) is not expansive. Moreover, in this instance, SEC Releases and an interrelationship between § 16(a) and § 16(b) are involved; the cited Supreme Court cases do not deal with interpretations in a similar context. Similarly, in the instant case, unorthodox transactions calling for the application of the pragmatic approach are not present. See discussion at pages 522-523 supra.
 
 
 46
 Our analysis, though approaching the issue through the theory of "beneficial ownership", arrives at the same conclusion as our analysis of whether "profits were realized" by William. See discussion at page 524 supra. Thus, the district court's finding of liability under § 16(b) must be affirmed.
 
 III.
 TWO YEAR LIMITATIONS PERIOD
 A. Background
 
 47
 Section 16(b) provides that no suit under the section "shall be brought more than two years after the date such profit was realized." On demand by the Corporation, William paid the amount claimed on January 29, 1971. This date became the applicable date from which the statute of limitations is measured. If the two year period is applicable, then the Corporation is limited to recovery of profits realized only after January 29, 1969.
 
 
 48
 But how is the application of the two year time limit of § 16(b) to be construed? The parties present three theories of interpretation. First, William advances the "strict" interpretation under which the two years run strictly from the time the profits were realized, without any tolling. Second, there is a "notice" or "discovery" interpretation under which the time period is tolled until the Corporation had sufficient information to put it on notice of its potential § 16(b) claim. Finally, the Corporation advances the "disclosure" interpretation under which the time period is tolled until the insider discloses the transactions at issue in his mandatory § 16(a) reports.[9]
 
 
 49
 The district judge hypothetically applied the notice interpretation. He found that various corporate officers had information which put the Corporation on notice throughout the relevant trading period. It was admitted that William did not disclose the transactions in his mother's shares on his § 16(a) reports as he was required to do. But the district court did not consider the disclosure interpretation separately, perhaps reasoning that actual notice would override any failure to report. Then, since tolling was not available, the district court determined it need not decide between the notice or strict interpretations.
 
 
 50
 On appeal, the Corporation renews its disclosure interpretation argument, and William renews the strict interpretation. Secondarily, accepting the notice interpretation, each side advances arguments that the facts do or do not support the district court's conclusion that the Corporation had notice. We hold the disclosure interpretation is the correct construction of § 16 and accordingly reverse the district court. Therefore, we need not reach the district court's conclusions based on the notice interpretation.
 
 B. Tolling and the Reporting Requirement
 
 51
 The ultimate question is one of congressional intent, "whether tolling the limitation in a given context is consonant with the legislative scheme." American Pipe and Construction Co. v. Utah, 414 U.S. 538, 558, 94 S.Ct. 756, 768, 38 L.Ed.2d 713 (1974). Neither the mere fact that a statute creating a cause of action also contains a time limitation nor whether a time limitation is viewed as substantive or procedural forecloses the question of allowing or disallowing tolling; the determinative factor is whether tolling is not inconsistent with the legislative purpose. See id. at 556-59, 94 S.Ct. at 767-769.
 
 
 52
 The bare words of the time provision of § 16(b) do not say whether tolling is or is not allowed. Normally, we would turn to the legislative history. But the legislative history of § 16(b) is silent concerning this provision. See Grossman v. Young, 72 F.Supp. 375, 378 (S.D.N.Y.1947) (first case construing time provision of § 16(b)). However, examining the legislative purpose of § 16 as a whole and considering the place of the time provision in that overall legislative scheme, we infer that tolling of the two year time period is required when the pertinent § 16(a) reports are not filed.
 
 
 53
 The legislative history and purpose of § 16, discussed in Part II-A above, clearly reveal a strong congressional intent to curb insider trading abuses. This purpose would be thwarted if insiders could escape liability by not reporting as required under § 16(a). "(I)t would be a simple matter for the unscrupulous to avoid the salutary effect of Section 16(b) which provides a remedy for the recovery of short term profits, simply by failing to file monthly reports in violation of subdivision (a) and thereby concealing from prospective plaintiffs the information they would need to adequately protect their interests. Such a construction would reward the violation of the statute and would manifestly frustrate congressional intent." Blau v. Albert, 157 F.Supp. 816, 819 (S.D.N.Y.1957). Accord Grossman v. Young, 72 F.Supp. at 378-79.
 
 
 54
 This conclusion is further supported by consideration of the complementary nature of § 16(a) and § 16(b). As subdivisions of the same section, they should be read together. See, e. g., Foremost-McKesson, Inc., 423 U.S. at 234 n.1, 96 S.Ct. at 511 n.1; American Standard Inc., 510 F.2d at 1058. See also discussion at pages 525-526 supra. The time limit is made a part of the section itself rather than incorporated by reference to another provision. The disclosures and reports of § 16(a) are an integral part of the context of § 16 within which § 16(b) must be read. The short limitations period is understandable only in the context of the insider's duty to make prompt disclosure. See Grossman v. Young, 72 F.Supp. at 378. "Effective operation of Section 16(b) is made possible by Section 16(a)'s requirement of full and prompt publicity...." Note, The Scope of "Purchase and Sale" Under Section 16(b) of the Exchange Act, 59 Yale L.J. 510, 512 (1950).
 
 
 55
 Similarly, Congress' express provision in § 16(b) that individual security holders may bring suit on behalf of the corporation to recover insider profits bolsters our interpretation. Even if other corporate officers or directors should know of an insider's transactions, this would not be the disclosure § 16 demands, because security holders can bring suit on the corporation's behalf. "Only by full compliance with Section 16(a) can the security holders be charged with adequate notice of the transaction." Cook & Feldman, Insider Trading Under the Securities Exchange Act (Part I), 66 Harv.L.Rev. 385, 414 (1953). Such shareholders are likely to be outsiders, minority holders. Their main source of information for the suits Congress has empowered them to bring likely will be the required § 16(a) reports.[10] If insiders could insulate their transactions from the scrutiny of outside shareholders by failing to file § 16(a) reports and waiting for the two year time limit to pass, then Congress' creation of these shareholders' derivative suits would be nullified.
 
 
 56
 This congressional interest in affording individual security holders the opportunity to sue under § 16 militates in favor of the disclosure interpretation over the notice interpretation in another respect. Under the notice interpretation, the question arises whether the knowledge of corporate officers or directors should be attributed to the corporation, thus giving it notice and allowing the limitations period to run. Normally, knowledge of corporate officials is imputed to the corporation. But in the § 16 context, if corporate officials' knowledge of another insider's trading and indeed even the trading insider's own knowledge were imputed to the corporation, then the corporation's right to recover the profits and especially the ability of minority shareholders to bring such suits would be seriously impaired. Cf. Schur v. Salzman, 365 F.Supp. 725, 733 (S.D.N.Y.1973); Jefferson Lake Sulphur Co. v. Walet, 104 F.Supp. 20, 23 (E.D.La.1952), aff'd, 202 F.2d 433 (5th Cir.), cert. denied, 346 U.S. 820, 74 S.Ct. 35, 98 L.Ed. 346 (1953) (corporation's § 16(b) suit not estopped on ground that corporation approved of transactions, since corporation's action under control of very insiders involved). See also Cook & Feldman, supra, 66 Harv.L.Rev. at 413-14. Collusion among insiders and, a more likely occurrence, the unarticulated acquiescence in or averting of gaze from a powerful insider's transactions thus would be rewarded under the notice interpretation. This problem does not arise under the disclosure interpretation. Thus, the disclosure interpretation adopted herein better serves the purposes of the statute.
 
 
 57
 Finally, the purpose of § 16 to impose absolute accountability within clearly demarcated boundaries, supports the disclosure interpretation. This goal of clear boundaries is served by a limitations period which can be mechanically calculated from objective facts. The dates on which purchases and sales are made are such facts, as are the dates on which § 16(a) reports are filed with the SEC. By contrast, under the notice interpretation, the running of the limitations period would depend on uncertain determinations of what knowledge should lead a corporation to discover its cause of action. Thus, the disclosure interpretation better serves the statute's purpose than the notice interpretation.
 
 C. Statutory Analysis and Prior Cases
 
 58
 Only a few cases have considered the two year limitation provision of § 16(b). Three cases from the Southern District of New York agree with our analysis. See Shattuck Denn Mining Corp. v. La Morte, (1973-74 Transfer Binder) CCH Fed.Sec.L.Rep. PP 94,429, at 95,472 (S.D.N.Y.1974). Blau v. Albert, 157 F.Supp. 816 (S.D.N.Y.1957); Grossman v. Young, 72 F.Supp. 375 (S.D.N.Y.1947). One case from the Middle District of Pennsylvania rejected this analysis and adopted a strict interpretation of the two year limit. See Carr-Consolidated Biscuit Co. v. Moore, 125 F.Supp. 423 (M.D.Pa.1954).[11] Grossman v. Young and Blau v. Albert are the better reasoned decisions, and reference is made to them for more elaboration of the disclosure interpretation. See also 2 L. Loss, Securities Regulation (2d ed. 1961) at 1055-58 (discussing the two year limitation, approving Grossman, and critizing Carr-Consolidated Biscuit Co.).
 
 
 59
 The court in Carr-Consolidated Biscuit Co. relied on the discarded theory that substantive statutes of limitation are entitled to literal application by the courts and may not be tolled. See 125 F.Supp. at 429-30. But this theory was effectively renounced by the Supreme Court in American Pipe and Construction Co. v. Utah, 414 U.S. 538, 556-59, 94 S.Ct. 756, 767-769, 38 L.Ed.2d 713 (1974). The Carr-Consolidated Biscuit Co., court also relied on a comparison of the limitation provision in § 16(b) with those in other securities statutes for example, §§ 9(e) and 18(c) of the 1934 Act, 15 U.S.C. §§ 78i(e) and 78r(c), and § 13 of the 1933 Act, 15 U.S.C. § 77m. See 125 F.Supp. at 430-31. In those statutes, Congress expressly provided for the operation of limitations periods in other than a strict manner. The court surmised that the absence of an express provision for tolling in § 16(b) necessarily shows congressional intent of a strict interpretation. Urging the strict interpretation, William renews this comparison of statutory provisions argument, citing recent Supreme Court cases in other securities areas using such an analysis. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206-09, 96 S.Ct. 1375, 1387-1388, 47 L.Ed.2d 668 (1976) (various standard-of-liability provisions of the 1934 Act must be read together); Blue Chip Stamps v. Manor Drugs Stores, 421 U.S. 723, 733-36, 95 S.Ct. 1917, 1924-1926, 44 L.Ed.2d 539 (1975) (various standing-to-sue provisions of the 1934 Act must be read together).
 
 
 60
 As an approach to statutory construction, this comparative analysis is obviously sound. In this instance, however, the comparison is not so helpful to William's position. First, the light those other provisions may shed on § 16(b) by comparison depends on the clarity of the other provisions in their own right. But the meaning of the other provisions of the 1934 Act, §§ 9(e) and 18(c), is not clear. See, e. g., Jacobson v. Peat, Marwick, Mitchell & Co., 445 F.Supp. 518, 526-27 (S.D.N.Y.1977) (construing "accrued" in § 18(c)).
 
 
 61
 Furthermore, the provisions actually appear silent on the question of tolling. They each create a three year limitations period from the time the action accrues but make an additional, shorter limit of one year from actual discovery of the facts constituting the action. Indeed, these provisions appear to have a meaning contrary to that advanced by William and Carr-Consolidated Biscuit Co. William argues these provisions expressly provide for tolling and therefore the absence of similar congressional expression in § 16(b) is revelatory. But, on their face, these provisions appear provide an absolute three-year maximum, beyond which suit may not be brought regardless of when the facts are discovered. See, e. g., Bader v. Fleschner, 463 F.Supp. 976, 981 (S.D.N.Y.1978). Thus, the absence of similar language creating a maximum time limit in § 16(b) shows that Congress contemplated tolling in appropriate circumstances in § 16(b) cases. We do not decide whether this interpretation of §§ 9(e) and 18(c) is correct. It merely shows that the comparative analysis argument advanced by William is unpersuasive.
 
 
 62
 Moreover, even if the comparison of § 16(b) with the other provisions were more favorable to William's position, the comparison of statutory provisions analysis would not be complete until the language of § 16(b)'s limitation provision had been considered in light of the context of all of § 16. As discussed earlier, § 16(b) is interrelated with the congressionally created reporting requirements of § 16(a). Sections 9(e) and 18(c) do not have similar disclosure provisions. Therefore, comparison with them is unhelpful in determining how a disclosure provision interacts with a limitations period.
 
 
 63
 In summary, we hold that an insider's failure to disclose covered transactions in the required § 16(a) reports tolls the two year limitations period for suits under § 16(b) to recover profits connected with such a non-disclosed transaction.[12] The two-year period for § 16(b) begins to run when the transactions are disclosed in the insider's § 16(a) report. See Blau v. Albert, 157 F.Supp. at 819; Shattuck Denn Mining Corp. v. La Morte, supra. This interpretation is consistent with the legislative scheme of § 16. It is supported by prior cases construing the section and by securities commentators. The district court's result on the limitations issue is therefore reversed.
 
 IV.
 PROFIT COMPUTATION METHOD
 
 64
 In calculating the profit realized as a result of William's securities transactions the district court used the "lowest purchase price, highest sale price" method. This method was set forth long ago by the Second Circuit in Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). Courts appear nearly unanimous in approving the Smolowe rule; commentators are also generally in favor, but there are some critics. See 2 L. Loss, Securities Regulation (2d ed. 1961) at 1062-65; 5 L. Loss, Securities Regulation (2d ed. Supp.1969) at 3024-25; Cook & Feldman, Insider Trading Under the Securities Exchange Act (Part II), 66 Harv.L.Rev. 612, 612-14 (1953). The question of the profit computation method for § 16(b) is one of first impression in this circuit. The Corporation urges that we adopt the long-standing Smolowe rule. William argues the Smolowe rule is incorrect and proposes a rule matching sales with purchases closest in time. Persuaded by its merit and its long continued use in other courts, we adopt the Smolowe rule.
 
 
 65
 Under the Smolowe rule, the highest sales price is matched with the lowest purchase price in any given six month period.[13] In analyzing the legislative history and the remedial nature of the statute, the court in Smolowe concluded:
 
 
 66
 The statute is broadly remedial. (citation omitted) Recovery runs not to the shareholder, but to the corporation. We must suppose that the statute was intended to be thoroughgoing, to squeeze all possible profits out of stock transactions, and thus to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary officer, director, or stockholder and the faithful performance of his duty. (citations omitted) The only rule whereby all possible profits can be surely recovered is that of lowest price in, highest price out within six months.
 
 
 67
 Smolowe, 136 F.2d at 239. Eight years later the Second Circuit again considered the profit computation issue and, after an independent analysis, affirmatively reasserted the Smolowe doctrine. Gratz v. Claughton, 187 F.2d 46, 50-52 (2d Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951) (L. Hand, J.).
 
 
 68
 The Second Circuit continues to adhere to the Smolowe rule. See Feder v. Martin Marietta Corp., 406 F.2d 260, 269 (2d Cir. 1969), cert. denied, 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 281 (1970); Adler v. Klawans, 267 F.2d 840, 847-48 (2d Cir. 1959). Cf. Cummings v. Commissioner, 506 F.2d 449, 452 (2d Cir. 1974), cert. denied, 421 U.S. 913, 95 S.Ct. 1571, 43 L.Ed.2d 779 (1975) (in analysis that insider's repayment of § 16(b) profits is a long term capital loss, court uses Smolowe approvingly).
 
 
 69
 The large majority of profit computation cases expectably are in the Second Circuit and, particularly, in the Southern District of New York. A long series of district court cases there have continued to apply the Smolowe rule. See, e. g., Lewis v. Levinson, (1978 Transfer Binder) CCH Fed.Sec.L.Rep. P 96,430 (S.D.N.Y.1978); Makofsky v. Ultra Dynamics Corp., 383 F.Supp. 631, 638-39 (S.D.N.Y.1974); Schur v. Salzman, 365 F.Supp. 725, 730-31 (S.D.N.Y.1973); Volk v. Zlotoff, 318 F.Supp. 864, 865 (S.D.N.Y.1970).
 
 
 70
 When the question of profit computation in § 16(b) has arisen in other courts, they too have adopted the Smolowe rule of lowest price in, highest price out. See Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736, 742-43 (8th Cir. 1965), cert. denied, 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966); Morales v. Mylan Laboratories, Inc., 443 F.Supp. 778, 780 (W.D.Pa.1978); Heli-Coil Corp. v. Webster, 222 F.Supp. 831, 837 (D.N.J.1963), aff'd as modified on other grounds, 352 F.2d 156 (3d Cir. 1965); Arkansas Louisiana Gas Co. v. W. R. Stephens Investment Co., 141 F.Supp. 841, 847 (W.D.Ark.1956). See also Ohio Drill & Tool Co. v. Johnson, 498 F.2d 186, 194-95 (6th Cir. 1974) (directing Smolowe rule be used in profit computation under state insider trading statute).
 
 
 71
 William cites one case as disapproving the Smolowe rule, namely, Allis-Chalmers Manufacturing Co. v. Gulf & Western Industries, Inc., 527 F.2d 335 (7th Cir. 1975), cert. denied, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976). In Allis-Chalmers, the Seventh Circuit declined to apply the Smolowe rule in the case before it. But the court in Allis-Chalmers did not reject the Smolowe rule; indeed it "agree(d) with the underlying principle of the ... Smolowe case." 527 F.2d at 355. The court distinguished its case from Smolowe on the ground that Smolowe involved the problem of trade-matching. There were multiple sales and purchases, and some rule had to be adopted to determine how they should be matched for computing profit. But Allis-Chalmers involved a question of valuation of the shares and was not a trade-matching case, and so the court did not apply the Smolowe rule. See 527 F.2d at 354-56. Cf. Anderson v. Commissioner, 480 F.2d 1304, 1307 (7th Cir. 1973) (in holding insider's repayment of § 16(b) profits a long term capital loss, Seventh Circuit approvingly cites Smolowe rule).
 
 
 72
 William also maintains the Smolowe rule is inconsistent with the legislative history of § 16(b). That the Smolowe rule serves the legislative purpose of § 16(b) is amply demonstrated in the previously discussed Second Circuit cases. William's principal argument is a comparison of the original version of § 16(b) with the final result. The original Senate and House versions of what became § 16(b) provided for a variation of the "lowest in, highest out" method of profit calculation.[14] This language did not appear in the final version enacted into law. William argues this shows congressional rejection of such a method of profit calculation and it is thus improper for the courts to resurrect it.
 
 
 73
 This argument is without substance. As William concedes in his brief, there is no statement anywhere in the legislative history as to why this language did not appear in the final version. There is no intimation that Congress disapproved of it. William's characterization of what occurred as "congressional rejection" is extreme. If Congress had deleted this language and replaced it with other language describing another method of profit calculation, one might infer that Congress disapproved of the prior language. Cf. National Automatic Laundry and Cleaning Council v. Shultz, 443 F.2d 689, 706 (D.C.Cir. 1971) (positive congressional action in rejecting amendments, unlike mere inaction, carries some weight). But all that occurred here is that certain language did not appear in the final version. Statutory interpretation cannot rest safely on mere inaction in Congress; nor can it rest on unexplained changes made in congressional committees. Federal Trade Commission v. Dean Foods Co., 384 U.S. 597, 609-10 & n. 11, 86 S.Ct. 1738, 1745 & n. 11, 16 L.Ed.2d 802 (1966); Trailmobile Co. v. Whirls, 331 U.S. 40, 61, 67 S.Ct. 982, 992, 91 L.Ed. 1328 (1947); United Sates v. Imperial Irrigation District, 559 F.2d 509, 535-36 (9th Cir. 1977), rev'd on other grounds sub nom. Bryant v. Yellen, 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980). Legislative silence cannot be viewed as an expression of congressional intent. Without some indication in the legislative history of the reasons why this change occurred, it is unwise to infer much from the silence of Congress. Cf. Scripps-Howard Radio, Inc. v. Federal Communications Commission, 316 U.S. 4, 11, 62 S.Ct. 875, 86 L.Ed. 1229 (1942) (search for significance in Congress' silence is often the pursuit of a mirage).
 
 
 74
 Also persuasive is the fact that in the over thirty-five years since Smolowe was decided and has been applied, Congress has failed to act to set aside the rule through contrary legislation. We believe the Smolowe rule is in accord with the absolute and thoroughgoing nature of liability under § 16(b). This statute is intended to be a deterrent to a type of activity which Congress realized was subject to much abuse. In some cases the Smolowe rule can be criticized for harshness and artificiality. But other methods would be equally artificial.[15] The Smolowe rule assures full recovery of profits for the corporation. The Smolowe rule of matching the lowest purchase price and highest sale price within six months serves the purpose of § 16(b). Following the unbroken acceptance of this method by other courts, we adopt it as the rule in this circuit. The district court is affirmed on this issue.
 
 V.
 PREJUDGMENT INTEREST
 
 75
 Although § 16 says nothing about the recovery of interest one way or the other, prejudgment interest is generally considered a part of § 16(b) recovery. However, its award is not mandatory. See generally 5 L. Loss, Securities Regulation (2d ed. Supp. 1969) at 3025-27. The allowance of interest is within the discretion of the trial court, but "the granting of such allowance should not follow as a matter of course." Gold v. Sloan, 486 F.2d 340, 353 (4th Cir. 1973), cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). Rather, in a § 16(b) case interest "is given in response to considerations of fairness. It is denied when its exaction would be inequitable." Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). "Whether interest will be awarded is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." Wessel v. Buhler, 437 F.2d 279, 284 (9th Cir. 1971) (10b-5 case). Accord Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d at 744 (§ 16(b) case). A reviewing court will upset the district court's decision granting or denying prejudgment interest only if it is so unfair or so inequitable as to require it. Blau v. Lehman, supra ; Blau v. Lamb, 363 F.2d 507, 528 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967).
 
 
 76
 Among the factors to be considered in weighing the equities is whether the insider acted innocently or knowingly. In many cases, interest has been denied where it was shown the insider acted in good faith. See, e. g., Gold v. Sloan, supra ; Oliff v. Exchange International Corp., 449 F.Supp. 1277, 1302 (N.D.Ill.1978); Morales v. Gould Investors Trust, 445 F.Supp. 1144, 1156 (S.D.N.Y.1977), aff'd without opinion, 578 F.2d 1369 (2d Cir. 1978); Volk v. Zlotoff, 318 F.Supp. 864, 867 (S.D.N.Y.1970); Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962, 968 (S.D.N.Y.1965).
 
 
 77
 These cases do not mandate a requirement of bad faith or willful violation for the award of prejudgment interest; rather, they justify its denial when such factors are absent. In the balancing of equities in these cases, it is not a one-dimensional question of subjective good or bad faith. The type and degree of the insider's inadvertence, the position of the insider in the corporation, and other circumstances of each case are considered. Even when bad faith may have been absent, interest is still sometimes awarded. See Champion Home Builders Co. v. Jeffress, 385 F.Supp. 245, 250 (E.D.Mich.1974); Perfect Photo, Inc. v. Grabb, 205 F.Supp. 569, 573-74 (E.D.Pa.1962). See also Magida v. Continental Can Co., 231 F.2d 843, 848 (2d Cir.), cert. denied, 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490 (1956). Cf. B. T. Babbitt, Inc. v. Lachner, 332 F.2d 255, 259 (2d Cir. 1964) (interest awarded without discussion). The insider must show there is an overriding inequity in allowing interest in order to overcome the granting of interest. Western Auto Supply Co., 348 F.2d at 744. The insider's good faith must be shown; bare allegations are not sufficient. Gold v. Sloan, 486 F.2d at 353; Lewis v. Realty Equities Corp., 396 F.Supp. 1026, 1034 (S.D.N.Y.1975).
 
 
 78
 When an insider repays the corporation promptly upon demand, that has been taken as betokening good faith and justifying denial of interest, especially when the prompt repayment means the corporation has not lost use of the money for a long time. See Abbe v. Goss, 411 F.Supp. 923, 926 (S.D.N.Y.1975); Lewis v. Wells, 325 F.Supp. 382, 387 (S.D.N.Y.1971).
 
 
 79
 Another factor in balancing the equities is the length of time involved. When there has been substantial delay between transactions and complaint or between complaint and judgment, courts consider who was responsible for the delay an important factor in allowing interest for such periods. See Gold v. Sloan, supra; Lewis v. Realty Equities Corp., 396 F.Supp. at 1035; Schur v. Salzman, 365 F.Supp. 725, 734-35 (S.D.N.Y.1973); Blau v. Lamb, 242 F.Supp. 151, 161 (S.D.N.Y.1965), aff'd, 363 F.2d 507, 528 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967). Moreover, a delay can also be a factor in establishing the date from which interest accrues. Normally, interest accrues from the time of the transactions. See, e. g., Western Auto Supply Co., 348 F.2d at 744. But where delay has occurred for which the insider was not responsible, in accommodating the equities some courts have awarded interest to run from the commencement of suit. See Champion Home Builders Co., 385 F.Supp. at 250; Schur, supra. In Schur the court particularly distinguished between the pre-complaint delay for which the plaintiff was responsible and the delaying litigation tactics for which the insider defendant was responsible.
 
 
 80
 In the case at bar, the district court awarded prejudgment interest on the profits recoverable, i. e., those not barred by the district court's ruling on the limitations issue. William argues the district court erroneously applied an absolute rule granting interest instead of weighing the equities. The use of an absolute rule without regard to the equities would be incorrect. But it is not apparent that the district court used an absolute rule. The lower court's opinion on this point may reflect a decision that, after considering the circumstances of this case, the equities did not tip in favor of departing from the usual objective nature of § 16(b) liability.
 
 
 81
 But we need not decide this today. Our decisions on liability and the limitations period may result in a larger amount of profit recovery and a longer period of liability. This may have an effect on the balance of equities. Thus we remand the question of prejudgment interest to the district court for reconsideration in light of the foregoing principles. See Thomas v. Duralite Co., Inc., 524 F.2d 577, 589 (3d Cir. 1975) (similar remand of prejudgment interest in 10b-5 case). We express no opinion on whether prejudgment interest is appropriate here. The balancing of equities on the award of interest must be done in light of all the facts and circumstances of the case. In the first instance, that determination is left to the discretion of the district court.
 
 CONCLUSION
 
 82
 We hold today that William is liable under § 16(b) for profits realized in transactions connected with William's trading of shares held in his mother's name. In this result we agree with the district court. However, we also hold that the two-year limitations period of § 16(b) is tolled as long as the insider has not disclosed the transactions on the required § 16(a) reports. Thus, since reports of the transactions in question here were not filed, William's liability is not cut off by the limitation period. We reverse the district court in this regard. Further, we agree with the district court that the Smolowe rule for trade-matching to calculate profits is correct. Finally, we remand the award of prejudgment interest to the district court for reconsideration.
 
 
 83
 AFFIRMED in part; REVERSED and REMANDED for proceedings in accordance with this opinion.
 
 
 
 *
 Honorable William H. Orrick, Jr., United States District Judge for the District of Northern California, sitting by designation
 
 
 [1]
 Similarly, motions to reconsider the award of attorney's fees and motions to add attorney's fees to the judgment have been treated as Rule 59(e) motions. See Hammond v. Public Finance Corp., 568 F.2d 1362 (5th Cir. 1978); Stacy v. Williams, 50 F.R.D. 52 (N.D.Miss.1970), aff'd, 446 F.2d 1366 (5th Cir. 1971); Farmington Dowel Products Co. v. Forster Mfg. Co., 421 F.2d 61, 76 n. 39 (1st Cir. 1969). Contra Lichtenstein v. Lichtenstein, 55 F.R.D. 535, 537 (E.D.Pa.1972), rev'd on other grounds, 481 F.2d 682 (3d Cir. 1973), cert. denied, 414 U.S. 1144, 84 S.Ct. 895, 39 L.Ed.2d 98 (1974) (motion to amend judgment to add attorney's fees treated as 54(d) motion, not 59(e) motion, but done so in order to avoid dismissal of motion as untimely)
 
 
 [2]
 See 368 F.Supp. at 253. William also relies extensively on Knowles v. United States, 260 F.2d 852 (5th Cir. 1958). But Knowles does not aid William. In Knowles, the plaintiff was disputing only two items of cost. Moreover, those costs had been levied on plaintiff by the district court in regard to a prior appeal of the case; they were not directly related to the judgment appealed from. Those costs were treated as a separate matter by both the district court and the Fifth Circuit. Finally, from the Fifth Circuit's opinion it is apparent neither that the motion to vacate these costs was made or treated as a Rule 59(e) motion nor that it was even timely filed as a Rule 59(e) motion with respect to the judgment Knowles sought to appeal. If it were not a timely Rule 59(e) motion, it could not have extended the time for appeal
 
 
 [3]
 The problem was only partly that the judgment as signed had expressly contained an award of costs to William. Even if that were not in the judgment, and the Clerk had merely awarded costs to William as a matter of course as the "prevailing party," a motion challenging the Clerk's action on the ground that the Corporation should be deemed the true prevailing party would still be a Rule 59(e) motion insofar as it sought an interpretive amending of the judgment
 
 
 [4]
 More accurately, if the Corporation's position is correct and these securities are treated as William's, then profits would be computed by comparing purchases and sale of all the securities (both in Beulah's and William's names) and not merely comparing purchases and sales of those securities in the mother's name
 
 
 [5]
 This account is taken principally from pages 4-6 and 12-13 of the district court's unpublished opinion, reprinted in (1977-1978 Transfer Binder) CCH Fed.Sec.L.Rep. P 96,008 at 91,528-29 & 91,531
 
 
 [6]
 The district court also noted that this was supported further by the fact that William was the sole beneficiary under his mother's will and would be her sole intestate heir, that she was of an advanced age and in poor health, and that it was unlikely that her will would be changed
 
 
 [7]
 William also cites several cases in which other provisions of § 16(b) have been construed strictly and argues that "profits realized by him" must be similarly construed. See Foremost-McKesson, Inc., supra; Kern County Land Co., supra; Reliance Electric Co., supra. See page 10 supra. See also Lewis v. Mellon Bank, 513 F.2d 921 (3d Cir. 1975); American Standard, Inc. v. Crane Co., 510 F.2d 1043 (2d Cir. 1974), cert. denied, 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975)
 
 
 [8]
 SEC Release 7793 is reprinted in CCH Fed.Sec.L.Rep. PP 26,031 & 26,032. It appears in pertinent part in Whiting, 523 F.2d at 686 n.10. For general discussions of Release 7793, see 5 L. Loss, Securities Regulation (2d ed. Supp. 1969) at 3063-66; Feldman & Teberg, Beneficial Ownership Under Section 16 of the Securities Exchange Act of 1934, 17 Case Western Res.L.Rev. 1054 (1966)
 
 
 [9]
 There is also mention of a fraudulent concealment theory under which the time limit is tolled as long as the insider conceals the transactions from the Corporation. But as it has been used in the few prior § 16(b) cases, this is only a step in the analysis toward the disclosure interpretation. The failure to disclose in § 16(a) reports, whether intentional or inadvertent, is deemed concealment, thus triggering the traditional equitable tolling doctrine of fraudulent concealment. See, e. g., Blau v. Albert, 157 F.Supp. 816, 819 (S.D.N.Y.1957) (quoting Cook & Feldman, Insider Trading under the Securities Exchange Act (Part I), 66 Harv.L.Rev. 385, 413 (1953))
 
 
 [10]
 The reports are available to the public at the SEC and at the exchanges. 17 C.F.R. § 240.24b-3(a). The information in all the reports is compiled and published by the SEC in a pamphlet available at SEC offices and exchanges and widely distributed by subscription. See 2 L. Loss, Securities Regulation (2d ed. 1961) at 1039 & n.9
 
 
 [11]
 In four other cases, the two year limit, strictly calculated, was held to bar suit or was assumed to be the measure, but in these cases the question of tolling due to failure to file § 16(a) reports was not presented. See Morales v. Mylan Laboratories, Inc., 443 F.Supp. 778 (W.D.Pa.1978); Cowsar v. Regional Recreations, Inc., 65 F.R.D. 394 (M.D.La.1974); Chambliss v. Coca-Cola Bottling Corp., 274 F.Supp. 401 (E.D.Tenn.1967), aff'd, 414 F.2d 256 (6th Cir. 1969), cert. denied, 397 U.S. 916, 90 S.Ct. 921, 25 L.Ed.2d 97 (1970); Blau v. Lamb, 191 F.Supp. 906 (S.D.N.Y.1961)
 
 
 [12]
 We note that the American Law Institute's proposed Federal Securities Code expressly provides for tolling in insider liability recovery while there is violation of the reporting requirement. See Federal Securities Code (Proposed Official Draft, March 15, 1978) §§ 605(a) (reporting requirements), 1717 (insider liability), & 1727(d) (statute of limitations and tolling)
 
 
 [13]
 The operation if the Smolowe rule is explained at, e. g., 2 L. Loss, Securities Regulation (2d ed. 1961) at 1063 (quoting Rubin & Feldman, Statutory Inhibitions upon Unfair Use of Corporate Information by Insiders, 95 U.Pa.L.Rev. 468, 482-83 (1947))
 
 
 [14]
 The pertinent language of the earlier bills provided as follows:
 For the purposes of this subsection the profit shall be calculated on the sale or sales by such person of such security made at the highest price or prices and on the purchase or purchases made by such person of such security at the lowest price or prices during the six months' period, irrespective of the certificates for such security received or delivered to such person during such period.
 S. 2693, H.R. 7852, 73d Cong., 2d Sess. § 15(b) (1934), reprinted in Legislative History of the Securities Act of 1933 and Securities Exchange Act of 1934 (Ellenberger & Mahar ed. 1973).
 
 
 [15]
 William urges a rule whereby purchases are matched against the immediately preceding or immediately following sales, whichever is higher. A similar proposal, that the matching of shares be on a last in-first out basis, was rejected in Lewis v. Levinson, (1978 Transfer Binder) CCH Fed.Sec.L.Rep. P 96,430 (S.D.N.Y.1978)