Macauley **WHITING**, Plaintiff,

v.

**DOW CHEMICAL COMPANY**,
Defendant.

No. 74 Civ. 1867.

United States District Court,
S. D. New York.

Dec. 24, 1974.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for plaintiff; Russel H. Beatie, Jr., Brendan P. Bovaird, New York City, of counsel.

Wilmer, Cutler & Pickering, Washington, D. C., Poletti Freidin Prashker

Feldman & Gartner, New York City, for defendant; Arthur F. Mathews, Stephen F. Black, Washington, D. C., Paul R. Grand, New York City, of counsel.

ROBERT J. WARD, District Judge.

Plaintiff Macauley Whiting brings this action pursuant to Section 16(b) of the Securities Exchange Act of 1934 ("§ 16(b)" of "the Exchange Act"), 15 U.S.C. § 78p(b), and 28 U.S.C. § 2201, seeking a declaratory judgment that he is not liable to defendant Dow Chemical Company ("Dow") for profits allegedly realized upon certain sales and purchases of Dow stock in September, November and December of 1973. Dow counterclaims for $208,203.80 plus interest, the amount which it contends is recoverable by the company according to the applicable rules of law, should this Court find plaintiff liable under § 16(b). The Court has jurisdiction and venue is proper in this district. 15 U.S.C. § 78aa.[1]

Mr. Whiting has been a director of Dow since 1959. His wife, Helen Dow Whiting, a granddaughter of the founder of Dow, has owned Dow common stock since childhood and substantial quantities of that stock (although less than 10% of the outstanding shares of the company) since 1962. The common stock of Dow is an equity security registered and traded on the New York Stock Exchange, Inc., and is not an exempted security within the meaning of 15 U.S.C. § 78c(a)(12). The present controversy arises out of Mrs. Whiting's sale of 29,770 shares of common stock of Dow during September and November, 1973 at various prices totalling $1,645,063.58, and Mr. Whiting's exercise, on December 27, 1973, of an option granted to him by Dow to purchase 21,420 shares of its common stock at an aggregate option price of $520,774.[2] The question now before the Court is whether Mr. Whiting thereby "realized profit

---

1. Prior to the institution of this action, Dow advised Mr. Whiting of its intention to recover the amount in question.

2. Neither Mr. nor Mrs. Whiting made any other purchase or sale of Dow stock during the relevant time period.

. . . from any purchase and sale, or sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months . . ." within the meaning of § 16(b) of the Exchange Act. The parties base their arguments in large part upon the premise that that question in turn rests upon whether Mr. Whiting is the "beneficial owner" of the shares held by his wife.

Defendant vigorously contends that the purposes of § 16(b) can be effectuated only if it is held to apply to the situation now before the Court; plaintiff equally vigorously argues that the holdings and the transactions of husband and wife in this case are separate and cannot be matched against each other for purposes of § 16(b) liability. Both Mr. and Mrs. Whiting testified at the trial.

Plaintiff demonstrated that his wife has assets many times greater than his own, and from them pays by far the largest share of the family expenses. She maintains her own personal records, her own checking and brokerage accounts, and does not mingle her assets with his. While the largest part of her personal estate consists of her Dow common stock, Mr. Whiting does not communicate with his wife concerning the affairs of the company. Mrs. Whiting controls all specific transactions involving her assets, to the extent that she has placed them in a discretionary account with Smith, Barney & Co., Inc., to whom she has given general instructions and some of whose specific purchases she authorizes. She does not, as a matter of practice, discuss individual transactions with her husband, and there is no evidence that he controls her decisions concerning even the general aspects of her management of her estate. It is clear that Mrs. Whiting autonomously manages her own separate estate and is not the "alter ego" of her insider husband.

It is also clear, however, that the Whitings enjoy the mutual affection, respect and communication which one would expect of a happily married couple, and that together they and their children benefit, in terms of style of life, from Mrs. Whiting's substantial wealth. They share a common home, own a vacation home which they use together, and Mr. Whiting does contribute virtually his entire salary to defray the family expenses which are met primarily by Mrs. Whiting.

Mr. Whiting serves as trustee of several trusts in their children's names, which consist largely of gifts of Dow common stock from Mrs. Whiting. She commonly takes advantage of his annual gift tax exclusion to make gifts to their children's trusts, as well as to charitable organizations. They file a joint income tax return which maximizes the deductions available to both. They use the same financial advisers although their accounts are formally separate, and they are frequently, although not invariably, present together at meetings with those advisers to discuss the overall management of their respective estates and the estates of their children. Mrs. Whiting pays the fees of these advisers. Together the Whitings have discussed the general philosophy which should govern the management of Mrs. Whiting's estate, and in early 1972 agreed upon a major shift in that philosophy. Since that time she has disposed of certain percentages of her Dow stock annually, reinvesting the proceeds elsewhere in the interest of diversifying her holdings and obtaining maximum tax benefits. Upon occasion Mrs. Whiting consults her husband concerning the desirability of certain investments in areas of his expertise, and although she does not invariably follow his advice she appears to have considerable respect for his opinion. In short, the resources of both husband and wife are significantly directed toward their common prosperity, and they easily communicate concerning matters which relate to that prosperity.

### Discussion

Congress enacted both § 16(a) and § 16(b) of the Exchange Act (15 U.S.C. §

78p)[3] for the purpose of preventing speculation based upon inside information or other abuses of their position by directors, officers, and large shareholders of registered corporations. Section 16(a) subjects all holdings and transactions by such persons to the closest scrutiny, in order that detailed exposure itself will discourage abuses. 2 Loss, Securities Regulation 1038 (1961). Section 16(b) focuses more directly on the evil of abuse of inside information for short-swing speculation in the securities of the insiders' corporations, and somewhat arbitrarily requires insiders of a listed corporation to disgorge to the corporation any profit realized upon purchases and sales of its securities within six months.[4]

The words, "beneficial owner," are used in § 16(a) and § 16(b) for

---

3. § 78p. Directors, officers, and principal stockholders

(a) Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security, shall file, at the time of the registration of such security on a national securities exchange or by the effective date of a registration statement filed pursuant to section 78*l*(g) of this title, or within ten days after he becomes such beneficial owner, director, or officer, a statement with the Commission (and, if such security is registered on a national securities exchange, also with the exchange) of the amount of all equity securities of such issuer of which he is the beneficial owner, and within ten days after the close of each calendar month thereafter, if there has been a change in such ownership during such month, shall file with the Commission (and if such security is registered on a national securities exchange, shall also file with the exchange), a statement indicating his ownership at the close of the calendar month and such changes in his ownership as have occurred during such calendar month.

(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

4. The Supreme Court has recently expressed the purpose of this provision:

Congress recognized that short-swing speculation by stockholders with advance, inside information would threaten the goal of the Securities Exchange Act to "insure the maintenance of fair and honest markets." 15 U.S.C. § 78b. Insiders could exploit information not generally available to others to secure quick profits. As we have noted, "the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972). As stated in the report of the Senate Committee, the bill aimed at protecting the public "by preventing directors, officers, and principal stockholders of a corporation . . . from speculating in the stock on the basis of information not available to others." S.Rep.No.792, 73d Cong., 2d Sess., 9 (1934).

Kern County Land Co. v. Occidental Corp., 411 U.S. 582, 591–592, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

two different purposes. First, "insider" status may derive from beneficial ownership of more than ten percent of the equity securities of an issuer of registered securities. Insider status carries with it both an obligation to report holdings and transactions to the Securities and Exchange Commission ("the Commission"), under § 16(a), and possible liability for profits under § 16(b). Second, § 16(a) imposes upon officers and directors of an issuer of registered securities, in addition to ten percent beneficial owners, the obligation to report to the Commission the amount of securities of that issuer of which they are the beneficial owner, as well as any changes in that ownership. Thus the words "beneficial owner" at once define one category of persons who are subject to both sections 16(a) and 16(b), and determine which holdings all insiders must report, under § 16(a).

■ The reporting requirements of § 16(a) are broader in scope than the liability provisions of § 16(b); changes in beneficial ownership within a six-month period, such as transfer of shares whether by gift or for consideration to a spouse or other family member, although duly reported, may not always give rise to liability. 2 Loss, Securities Regulation, 1082–3, nn. 197–199 (1961); 5 Loss, Securities Regulation 3066 (1969); Feldman & Teberg, Beneficial Owner-ship Under § 16 of the Securities Exchange Act of 1934, 17 W.Res.L.Rev. 1054, 1063 (1966). The Commission has supported broad interpretations of the reporting requirements, reasoning that Congress intended the trading activities of insiders to be subject to the most careful scrutiny, for its deterrent effect not only upon abuse of inside information for short-swing profit, but also upon other abuses to which other sections of the statute are more specifically directed. See Feldman & Teberg, supra at 1063.

■ The question under § 16(b) is more narrowly whether the insider has "realized profit" by "any purchase and sale," terms not completely defined in the statute, but interpreted by the courts and the Commission in light of the purposes of that section. In interpreting the language of § 16(b), the courts have kept in mind that § 16(b) was designed to be largely automatic in application,[5] and to "squeeze all possible profits" from short-swing trades by insiders, Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir. 1943), cert. denied, 320 U.S. 751, 64 S.Ct. 46, 88 L.Ed. 446 (1943), and have strictly construed the language in favor of the corporation's recovery of maximum amounts. They have also, on occasion, mitigated the harsh effects of the rule by examining whether a transaction or individual

5. One court has recently discussed the automatic nature of the rule of § 16(b):

In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect. See Petteys v. Butler, supra, 367 F.2d [528,] at pp. 532–533; Smolowe v. Delendo, supra, 136 F.2d at pp. 236–237; Blau v. Lamb, supra, 363 F.2d at p. 515. The harshness of the rule was mitigated, how-

ever, by confining its coverage to a period of six months, thereby ensuring the minimum adverse effect upon valuable, long-term investments and at the same time facilitating easy and certain compliance with the strictures of Section 16(b). The thrust of the statutory scheme thus placed responsibility for meticulous observance of the provision upon the shoulders of the insider. He was deemed capable of structuring his dealings to avoid any possibility of taint and therefore must bear the risks of any inadvertent miscalculation. Cf. Polaroid Corp. v. Casselman, 213 F.Supp. 379, 382 (S.D.N.Y.1962); see generally, II Loss, Securities Regulation, Ch. 6C, pp. 1040, et seq. (2d ed. 1961).

Bershad v. McDonough, 428 F.2d 693, 696 (7th Cir. 1970).

class of transactions lends itself specifically to the abuses the section is designed to prevent, *e. g.,* Kern County Land Co. v. Occidental Corp., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972); Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), and if it does not, have strictly construed the language in favor of the insider. There has thus emerged a tension between not always compatible guides, reflected in dissenting opinions to significant cases as they are decided.

In Blau v. Lehman, *supra,* for example, the Supreme Court held a partner liable for only his pro-rata share of profits realized upon his partnership's purchase and sale within six months of shares in a corporation of which he was a director. The partnership had acted independently of any specific advice from him, without his specific knowledge, and he disclaimed any interest in any proceeds of the transactions. The Court refused to hold that the partnership as a whole was an insider, or to accept the harsh effect of holding the director liable for the full amount of profit realized by the partnership, since the language of § 16(b) speaks specifically to "profit realized by him" referring solely to the insider. In a vigorous dissent Justice Douglas urged that the partnership as a whole be considered a person, an insider because one of its members was an insider. He discussed the large potential for abuse of inside information in the partnership context, emphasizing the automatic and arbitrary character of the section and the Court's consistent prior policy of rigorously squeezing all profit from transactions by insiders in a six-month period. 368 U.S. at 414, 82 S.Ct. 451 et seq.

Again, in Reliance Electric Co. v. Emerson Electric Co., *supra,* the court looked to the strict language of § 16(b), and in the context of a defeated tender offer permitted a ten percent beneficial owner deliberately to dispose of shares acquired within six months in two stages, only one of which would be subject to § 16(b) liability. The majority reasoned that Congress has created a strict and arbitrary rule of liability which should not be extended beyond the literal meaning of the section's language. Justice Douglas' dissent emphasized the prophylactic purpose of § 16(b), and again urged a flexible construction of the statute which would serve that purpose. 404 U.S. at 427, 92 S.Ct. 596 et seq.

And most recently, in Kern County Land Co. v. Occidental Corp., *supra,* the Supreme Court held that in the context of a defeated tender offer, a binding option agreement to sell the shares acquired during the campaign, negotiated within six months of purchase, but effective only beyond that time, was not a "sale" for purposes of § 16(b) liability. The court considered the transaction not susceptible of the kind of abuse toward which § 16(b) is directed. Once more, Justice Douglas argued for a strict and automatic application of the statute, a "bright-line test," even should that include some who were not in a position to abuse inside information. 411 U.S. at 605, 93 S.Ct. 1736 et seq.

▪ This Court is now asked to interpret the language of § 16(b), "profit realized by him from any purchase and sale, or any sale and purchase," to impose liability where an insider purchases and his spouse sells shares of his company, if he "beneficially owns" her stock for purposes of § 16(a) reports. The Court concludes that the language of § 16(b) should be interpreted to impose liability, and in so doing, applies the guideline expressed by the majority in *Kern*:

> In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information—

thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits. Kern County Land Co. v. Occidental Corp., *supra* at 594–595, 93 S.Ct. at 1744–1745.

■ In the context of § 16(a), the Commission has evolved a dual test of an insider's beneficial ownership of his or her spouse's shares. See 2 Loss, Securities Regulation 1101 (1961); 5 Loss, Securities Regulation 3063–66 (1969). Such beneficial ownership may derive from the insider's "power to revest" in himself title to those shares.[6] Or it may result from his enjoyment of "benefits substantially equivalent to those of ownership." In a release dated January 19, 1966, the Commission described such benefits. Sec.Ex.Act Rel. 7793. They include use of the spouse's income or profits for the maintenance of a common home or to meet expenses which would otherwise be met from other sources, and the ability to exercise a controlling influence over the purchase, sale or voting of those securities. The Commission specifically required, as a matter of course, the reporting of securities held by any relative of an insider who shares a common home with him, in effect creating in such a situation a presumption of beneficial ownership for reporting purposes. The report may, however, be accompanied by a disclaimer of beneficial ownership, so that an insider may always in a particular case show that despite this living arrangement he does not receive "benefits substantially equivalent to those of ownership" from the relative's shares.[7] Moreover, the Commission later stated that the report alone does not constitute an admission of beneficial ownership for purposes of § 16(b) liability, but said that the question of "profits realized upon the purchase and sale . . ." will always be decided on the particular facts of each case in the context of litigation. Sec. Ex.Act Rel. 7824, February 14, 1966.

Plaintiff argues that the Commission has thus established reporting requirements designed to reveal all transactions in which an insider may have any interest, but that § 16(b) liability may not be found except where the insider has in fact controlled the transactions so closely that the spouse is either his "alter ego" or agent. Blau v. Lehman, *supra*; Reliance Electric Co. v. Emerson Electric Co., *supra*; Blau v. Mission Corp., 212 F.2d 77 (2d Cir. 1954), cert. denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954); Alloys Unlimited, Inc. v. Gilbert, 319 F.Supp. 617 (S.D.N.Y. 1970). He refers to the broader scope of § 16(a), and the manner in which the courts have literally interpreted certain language in § 16(b) to limit liability except where it was clearly imposed.

■ But as the court earlier observed, the language of § 16(b) has always been interpreted by reference to the purposes of that section and, while there is hesitation to *extend* the statute by judicial construction of clear language, where words, such as "purchase" or "sale," are open to several interpretations the courts will construe them to effectuate the purposes of § 16(b). Furthermore, § 16(a) and (b) are interrelated, as the courts have recognized. Reliance Electric Co. v. Emerson Electric Co., *supra*, 404 U.S. at 426, 92 S.Ct. 596; Feder v. Martin Marietta Corp., 406 F.2d 260, 268 (2d Cir. 1969).

This Court considers the Commission's interpretation of "benefits substantially equivalent to those of ownership" useful in determining whether an insider realizes profits upon transactions in his spouse's shares of his company. Joint maintenance of a common home and the sharing of family expenses indicate initially so substantial a common interest that both profit where one obtains financial advantage. The ability to exercise a controlling influence over sales and purchases of the spouse's shares, particularly when combined with a sub-

---

6. It is unquestioned in this case that plaintiff has no power whatever to revest in himself title to his wife's shares of Dow stock.

7. Mr. Whiting consistently reported the shares of Dow held by his wife, and the changes in her holdings, without disclaimer.

stantial common interest in mutual prosperity, indicates that the family situation is susceptible to the abuses which § 16(b) was designed to prevent. Moreover, it indicates that, where necessary, the couple can time its transactions in the shares of the insider's corporation in accordance with the section's requirements.

The policies of § 16(b) would not be served were this Court to consider it applicable only to transactions in a spouse's shares when the spouse is the "alter ego" or agent of the insider. Increasingly, both parties in a marriage have independent means which they individually control; without in any way denying the autonomy of each the Court must recognize that the usual family unit shares the prosperity and the adversity of its members, and communicates concerning matters of common concern. The policies of automaticity and prophylaxis which underlie § 16(b) demand that the financial dealings of each spouse in the securities of a corporation of which one is an insider be attributable to the insider, where it is shown that the insider beneficially owns the spouse's stock for purposes of § 16(a) reports. To avoid liability the insider must demonstrate in some other way that the transactions, otherwise within the scope of § 16(b), generated no "profits realized by him."

Without analysis, several courts have reached the same conclusion. Blau v. Potter [1973 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,115 at 94,117 (S.D. N.Y.1973); Bershad v. McDonough, 428 F.2d 693 (7th Cir. 1970); Marquette Cement Mfg. Co. v. Andreas, 239 F. Supp. 962, 966–967 (S.D.N.Y.1965); see also, Rothenberg v. Sonnabend, ['61–'64 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 91,226 (S.D.N.Y.1963). In another case the parties stipulated that the insider is liable for transactions made by the spouse. B. T. Babbitt, Inc. v. Lachner, 332 F.2d 255 (2d Cir. 1964). In both Blau and Marquette the Court proceeded to decide that no such beneficial ownership was proved. In Marquette the court noted that the parties were legally separated at the time of the transactions, and divorced at the time of the action; in Blau the court emphasized the completely separate nature of the wife's assets, which were not used in any way for the common living expenses or for the wife's own support, over which the husband exercised no influence, and which were totally segregated as a matter of accounting practice. In these situations the possibility of the sort of abuse to which § 16(b) is directed is minimal, and the separation of financial interests and responsibilities is so clear that a court could not justly find that the insider had "realized profit."

As noted above, however, in the present case the segregation of assets and contributions to the family welfare is not so complete. In many ways the Whitings' expenditures are linked, although their assets are kept separate. They do communicate concerning financial matters deemed mutually important, and in their tax returns and charitable contributions have demonstrated an ability to combine their actions where it is to their joint advantage.

Moreover, the record shows that both Mr. Whiting and Mrs. Whiting were generally aware of the specific transactions of the other which are the subject of this litigation. Mr. Whiting knew that his wife had increased the pace of her disposition of Dow stock toward the latter part of 1973. She was aware that he possessed an option which he was required to exercise before it expired in June, 1974. She knew that he possessed insufficient funds to purchase the shares pursuant to his option and was considering obtaining a loan from the Harris Trust and Savings Bank ("the Harris Bank"), at which she had an account. Their accountants recommended, however, that his purchase be financed by a loan from her, since large sums of money generated by her disposition program for her Dow securities were available in her account for investment elsewhere. Although the Whitings initially

rejected this suggestion they did ultimately arrange that Mrs. Whiting should lend Mr. Whiting the purchase price for the exercise of his option at an annual rate of interest of 7%, payable over an indefinite period of time. Mr. Whiting had commenced negotiations with the Harris Bank, which he discontinued, stating in a letter to the bank: "We have been able to get the cash required from sale of stock and will not need the loan at this time."

It is also clear that the Whitings were mindful of their general § 16(b) exposure. Mrs. Whiting knew that she was required to file reports with the Commission because her husband was a director of Dow; she knew that her transactions were in some ways restricted by that fact, and that in a sense she was herself an insider and should time her own purchases and sales accordingly. In fact, she did not herself purchase Dow stock. Mr. Whiting listed her shares on the reports which he filed with the Commission pursuant to § 16(a), and had received memoranda alerting him to his potential liability for her transactions. It appears that he exercised his option at the time he did under the erroneous impression that this was not a "purchase" for purposes of liability under § 16(b). The Court is convinced that had the Whitings known specifically that that transaction was subject to § 16(b) they would have timed either her sales or his purchase differently. But, as noted above, insiders are deemed capable of structuring their transactions in accordance with the strict and arbitrary requirements of that section, and are held to bear the risk of their own inadvertence. The Court's conclusion in this respect merely reinforces its judgment that this family situation is of the sort to which § 16(b) is fairly addressed. Accordingly, judgment is awarded in favor of defendant.

The foregoing constitutes the findings of fact and conclusions of law of the Court for purposes of Rule 52, Fed.R. Civ.P.

Settle judgment on notice.