The REECE CORPORATION, Plaintiff,

v.

WALCO NATIONAL CORPORATION,
Defendant.

No. 80 Civ. 3252.

United States District Court,
S.D. New York.

Sept. 17, 1981.

On Damages June 7, 1983.

Powers & Hall by Andrew C. Bailey, Eric E. Mulloy, William A. Levine, Boston, Mass., Parker, Auspitz, Neesemann & Delehanty by Jack C. Auspitz, New York City, for plaintiff.

Butler, Jablow & Geller by William J. Butler, Stanley Geller, New York City, for defendant.

## OPINION

GRIESA, District Judge.

This is an action under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). Plaintiff The Reece Corporation, whose stock is publicly traded on the New York Stock Exchange, seeks to recover alleged short-swing profits realized by defendant Walco National Corporation in connection with the latter's transactions in Reece stock.

Walco moves for summary judgment dismissing the complaint. Reece cross-moves for summary judgment in its favor. Walco's motion is denied. Reece's cross-motion is granted on the issue of liability under § 16(b), subject to determination of the amount of recovery in further proceedings.

## I.

Walco is what has been referred to as an "acquisition minded" holding company with interests in diverse fields. By letter of October 13, 1966 the then president of Walco informed Franklin Reece, president of Reece, of Walco's interest in acquiring Reece. Reece made a strongly negative reply. This sequence of events was repeated in the fall of 1967, the spring of 1969, and the fall of 1977.

In July 1979 Walco commenced purchasing Reece shares on the open market. There were about 2.8 million shares outstanding. By January 30, 1980 Walco had acquired 212,100 shares of Reece, or slightly over 7.3% of the outstanding Reece stock. Particularly heavy buying occurred between January 18 and January 30, 1980, during which time 78,800 shares were purchased and the price of Reece stock rose from $8.75 per share to $10.75 per share. Walco purchased an additional 28,400 shares on February 4, 1980, bringing its holdings to a total of 240,500 shares, or 8.4% of the total outstanding. By this time Reece stock had risen to $12.50 per share.

On February 4, 1980 Reece commenced an action in the United States District Court for the District of Massachusetts, alleging various violations of the Securities Exchange Act and Securities and Exchange Commission regulations. At about the same time two of Reece's shareholders brought a similar suit, which was consolidated with the Reece suit.

Reece moved for a preliminary injunction to prevent additional purchases of stock by Walco. The motion was denied on February 29, 1980. Reece noticed an appeal from this ruling, and moved for an injunction restraining further stock purchases by Walco pending resolution of the appeal. This motion was denied.

In March 1980 Walco resumed purchasing Reece stock. A purchase of 5100 shares on March 27 put Walco's holdings slightly over the 10% mark, the total Walco purchases as of that date amounting to 285,600 shares. Thereafter Walco purchased an additional 130,700 shares, at prices ranging from 8⅝ to 10½. The last Walco purchase was made on April 10. Walco then owned a total of 416,300 shares, which was 14.48% of the outstanding.

In mid-April John W. Reece, chairman of the board of Reece, met with Paul Schurgot, Jr., president of Walco. Reece proposed an arrangement, which would include a settlement of the pending litigation, under which Reece would purchase all of Walco's holdings for approximately $12 per share if Reece received assurance that Walco would not re-enter the market for Reece shares in the foreseeable future. Attorneys for the two sides discussed the format for such an agreement. Walco's attorney asserted that Walco would consent to such an arrangement only if the transaction were divided into two parts so as to avoid § 16(b) liability. Reece's attorney stated he had no objection to such a divided sale.

From April 22, 1980 the attorneys conferred and discussed the proposed agreement in more detail. Walco's attorney suggested that the first stage consist of a sale of 170,700 shares at $9.25 per share, with

the second stage to consist of a sale of 245,600 shares at $13.91 per share. The average price for all the shares would be $12 per share.

In subsequent negotiations, involving both principals and attorneys, the price-per-share for the first stage of the transaction was lowered to $8.75. The purpose of this was to make sure that Walco would go through with the second stage. In other words, in order to create the appearance of separate transactions, Walco was not to be legally bound by any express terms to carry out both stages. However, Reece wished to have Walco under economic compulsion to do so. This was the reason for lowering the share price of the first stage. As part of this strategy, the number of shares to be sold in the first stage was reduced from 170,700 to 143,275. The number of shares in the second stage was increased from 245,600 to 273,025. The revised per share price for the second stage was $13.70.

Two agreements were executed, dated April 29 and April 30. The first agreement was for the sale of 143,275 shares for a price of $1,253,656. The second agreement was for a sale of 273,025 shares for a price of $3,741,944. The first agreement included a clause providing for dismissal of the lawsuits. The second agreement contained a provision to the effect that Walco would not thenceforth acquire or hold any Reece stock for a period of seven years. Both agreements contained clauses whereby Reece would indemnify Walco for the cost of any litigation arising out of the execution of the agreements, with the exception of any action arising under § 16(b) of the Securities Exchange Act.

Walco and Reece carried out the sale transactions of April 29 and April 30. The lawsuits were discontinued as agreed.

Six weeks later Reece brought this action under § 16(b) to recover Walco's alleged short-swing profit.

II.

In enacting Section 16(b),[1] Congress imposed a flat rule taking the profits out of short term securities trading by insiders. Congress believed that the possibility of abuse in these transactions was "intolerably great." *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972). An important characteristic of the statute has been stated as follows:

"The objective standard of Section 16(b) imposes strict liability on substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation." *Bershad v. McDonough,* 428 F.2d 693, 696 (7th Cir.1970).

The language of the statute has been strictly construed against insider traders in order to "squeeze all possible profits" from short-swing deals. *Smolowe v. Delendo Corp.,* 136 F.2d 231, 239 (2d Cir.), *cert. de-*

---

1. "(a) Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security, shall file, at the time of the registration of such security on a national securities exchange or by the effective date of a registration statement . . . .

"(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was ac- quired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, . . . . This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

*nied,* 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943); *Whiting v. Dow Chemical Co.,* 386 F.Supp. 1130, 1134 (S.D.N.Y.1974), *aff'd,* 523 F.2d 680 (2d Cir.1975).

The obvious issue in the present case is created by the fact that the April 1980 sale of Walco shares was structured in two stages. The relevant chronology was as follows:

(a) As of March 27, 1980 Walco was a beneficial owner of more than 10% of Reece common stock.

(b) Walco's further purchases of Reece common stock were purchases by "such beneficial owner" within the meaning of § 16(b).

(c) Walco's first-stage transaction of April 29 was within six months following such further purchases and occurred while Walco was still a beneficial owner of more than 10% of Reece stock. Clearly the April 29 transaction was a sale (or a portion of a sale) within § 16(b).

(d) Following the April 29 transaction, and prior to the second-stage April 30 transaction, Walco was owner of less than 10% of Reece stock. If the April 30 transaction is considered a separate "sale" within the meaning of § 16(b), then it would not be a sale by an owner of more than 10% of the Reece stock.

Reece contends that the April 29 and April 30 transactions must be construed to be one "sale" for the purposes of applying § 16(b), and that viewed in this light Walco was a beneficial owner of more than 10% of the Reece stock at the time of this "sale" and liable for short-swing profits on the basis of both the April 29 and April 30 transactions. Walco, on the other hand, naturally argues to the contrary—that the April 29 and April 30 transactions are two different sales for the purpose of applying § 16(b).

Walco's argument is based upon the Supreme Court decision in *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972), and indeed the crucial issue in the present case is whether *Reliance* is controlling or is distinguishable.

In *Reliance,* Emerson Electric acquired 13.2% of the outstanding common stock of Dodge Manufacturing Co. This acquisition was the result of a tender offer made in an unsuccessful attempt to take over Dodge. When Dodge approved a merger with Reliance Electric, it became clear to Emerson that (1) further takeover efforts would be futile and (2) it was likely that Emerson would be forced to exchange its Dodge shares for shares in the new corporation—a type of transaction which had been held to constitute a "sale" within § 16(b). *Newmark v. RKO General, Inc.,* 425 F.2d 348, 354 (2d Cir.), *cert. denied,* 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970). Emerson's counsel designed an arrangement whereby it hoped to avoid § 16(b) liability. The plan was to dispose of its holdings in two transactions. The first, realizing little profit, would bring Emerson's holdings down to slightly under 10%. Then, no longer a more-than-10% owner, Emerson could sell the remainder of its shares and retain any profit. Emerson carried out this plan. The first sale was to a brokerage house, and the second sale was two weeks later to Dodge, the issuer.

Reliance, having acquired Dodge, made a claim against Emerson under § 16(b). The District Court, finding that the two sales were "effected pursuant to a single pre-determined plan of disposition with the overall intent and purpose of avoiding Section 16(b) liability," 306 F.Supp. 588, 592, held Emerson liable for the profit realized in the two sales. The Court of Appeals agreed with the finding that Emerson had intentionally structured the transaction to avoid § 16(b) liability, but stated that Emerson should not be faulted for this effort. 434 F.2d 918, 925 (8th Cir.1970). The Court reversed the finding of liability on the second sale, holding that as long as the sales are "not legally tied to each other and [are] made at different times to different buyers . . . ," 434 F.2d at 926, the two sales would not be treated as one sale in applying § 16(b).

The Supreme Court affirmed by vote of 4–3, with two justices not participating.

The majority opinion held that there were in fact two sales, and that Emerson could not be considered a 10% owner at the time of the second sale.[2] The majority stated:

"To be sure, where alternative constructions of the terms of § 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders. But a construction of the term 'at the time of . . . sale' that treats two sales as one upon proof of a pre-existing intent by the seller is scarcely in harmony with the congressional design of predicating liability upon an 'objective measure of proof.' —[citation].

\*     \*     \*     \*     \*     \*

"If a 'two-step' sale of a 10% owner's holdings within six months of purchase is thought to give rise to the kind of evil that Congress sought to correct through § 16(b), those transactions can be more effectively deterred by an amendment to the statute that preserves its mechanical quality than by a judicial search for the will-o'-the-wisp of an investor's 'intent' in each litigated case." 404 U.S. at 424–25, 92 S.Ct. at 600.

Since the time of the *Reliance* decision, there have been no reported cases dealing with similar attempts to structure a sale of stock in phases so as to avoid § 16(b) liability.

### III.

■ The issue in the present case is whether the two stages of Walco's April 1980 disposition of Reece stock should be treated as one sale for the purpose of applying § 16(b), or whether the *Reliance* holding requires that the literal form of the two sales should be given effect.

On the question of the application of the *Reliance* opinion, it is obvious that the facts in the present case are distinguishable from the facts in *Reliance.* The question is whether, in view of the remedial policies underlying § 16(b), the *Reliance* holding should be given a somewhat expansive effect or should be restricted closely to its facts. In my view, the latter is the proper course.

As to the factual distinctions between the two cases, *Reliance* involved two separate sales to two different buyers, which were not tied together in any manner except that Emerson made both sales. In the present case there was a single plan of disposition negotiated by Walco with the same buyer— Reece. From the start of the negotiations between Walco and Reece, it was agreed that the shares would be sold to Reece for a price of $12 per share. After this understanding was reached, the parties broke the transaction into two stages for the purpose of avoiding full § 16(b) liability. However, the average price per share of $12 never changed. The two stages of the sale took place one day apart. Although there was no express legal tie between the two phases, the transaction was structured with the expectation that one would not be carried out without the other. Neither side received the full bargained-for benefits from the first "sale." It was only after the completion of the entire transaction that Walco received its profits and Reece received the complete package of stock along with the covenants.

In the present case, from any standpoint of reality and substance, there was a single sale. The attempt to divide it into two "sales" was wholly artificial and contrived.

Section 16(b) should be read with sufficient liberality to carry out its remedial purpose. By the same token, the *Reliance*

---

**2.** Interestingly, under the law of § 16(b) as it is currently interpreted, Emerson would not have been liable for short-swing profits even if it had divested itself of all of its Dodge stock in a single transaction. This is so because, as now construed, a party must be a more-than-10% owner immediately prior to both the "purchase" and "sale" in a short-swing purchase-sale situation. *Foremost-McKesson v. Provident Securities Co.,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976). Under this rule, because Emerson acquired the 13.2% block of Dodge stock in one transaction, completing no additional purchases of the stock after attaining "insider" status, it could have incurred no § 16(b) liability.

opinion cannot properly be construed so broadly as to exempt from the statute transactions which in *substance* fall within its ambit, despite attempts to evade liability. The *Reliance* opinion itself makes this clear.

> "Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b). The question is, rather, whether the method used to 'avoid' liability is one permitted by the statute." 404 U.S. at 422, 92 S.Ct. at 599.

*See also Matas v. Siess,* 467 F.Supp. 217, 222 (S.D.N.Y.1979).

I conclude that the method used in the present case to avoid liability is not permitted by the statute.

### IV.

Walco argues that, even if it is held that the transaction falls within the ambit of Section 16(b), nevertheless there can be no recovery. Walco contends that, if the proper reading of the law is that the transaction is within § 16(b), then the transaction was based on a mistake. In addition, Walco goes so far as to claim fraud on the part of Reece in suing under § 16(b) after agreeing to the transaction, structured as it was. On the basis of these arguments, Walco contends that if it cannot retain the profits of its sale to Reece, it should be allowed to rescind.

The facts are clear that both Walco and Reece knew that this was nothing more than an *attempt* to avoid § 16(b) liability, but that the risk of such liability existed. Evidence of this is that Reece's indemnity agreement expressly excluded possible § 16(b) liability. Moreover, Reece made a carefully stated representation to Walco dated April 29, 1980 to the effect that Reece had no present intention of suing under § 16(b) and that the board of directors of Reece had given no consideration to any possible action and had received no advice or opinion from corporate counsel. This was substantially short of any covenant not to sue under § 16(b), as Walco must have known.

There was no fraud on the part of Reece which prevents it from suing and recovering under § 16(b). Moreover, since both sides knew, or should have known, of the risk of possible § 16(b) liability, there was no mistake of the kind which could offer a defense to Walco in this action or which would permit Walco to rescind.

In any case, the law is clear that, under circumstances such as those involved in the present case, Reece is not estopped or barred from recovering from Walco under the statute. *See, e.g., Newmark v. RKO General, Inc.,* 294 F.Supp. 358 (S.D.N.Y. 1968), *aff'd,* 425 F.2d 348 (2d Cir.), *cert. denied,* 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970); *Roth v. Fund of Funds, Ltd.,* 405 F.2d 421 (2d Cir.1968), *cert. denied,* 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969); *Tyco Laboratories, Inc. v. Cutler-Hammer, Inc.,* 490 F.Supp. 1 (S.D.N.Y.1980); *Volk v. Zlotoff,* 285 F.Supp. 650 (S.D.N.Y.1968).

### *Conclusion*

Walco's motion for summary judgment dismissing the action is denied. Reece's cross-motion for summary judgment is granted to the extent that Walco is held to be liable for any profits on the April 29–30, 1980 sale which may properly be assessed under § 16(b), the amount of which will be determined in further proceedings.

So ordered.

### ON DAMAGES

On September 17, 1981 this Court granted plaintiff The Reece Corporation's motion for summary judgment, on the issue of liability, with respect to its claim to recover short-swing profits realized by defendant Walco National Corporation in connection with Walco's transactions in Reece stock. Walco was held liable under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), for whatever profits it had realized on the sale of 75,700 shares of Reece stock.

Subsequently a hearing was held to determine the amount of damages to be assessed against Walco. The present opinion

constitutes the Court's findings of fact and conclusions of law on the issue of damages.

### Facts

Walco commenced purchasing Reece stock in the open market in July 1979. Walco became owner of more than 10% of the Reece shares on March 28, 1980. On that date Walco made two purchases. The first of these was of 55,000 shares, the acquisition of which gave Walco 11.9% of the 2,873,655 shares of Reece outstanding.* Walco made a second purchase on March 28 of 5,000 shares. Walco made additional purchases on March 31 and in early April. The last purchase was April 10. The total number of shares purchased commencing with the 5,000 share block on March 28 through April 10 was 75,700. It is agreed that this is the number of shares which Walco acquired while it was beneficial owner of more than 10% of the Reece stock.

The grand total of all shares purchased by Walco beginning in July 1979 was 416,300. This entire amount was sold to Reece on April 29–30, 1980. The 75,700 shares were part of this sale.

In connection with the calculation of Walco's profit on the sale of the 75,700 shares, the following table shows unit and total prices for the purchases.

| Date of Purchase | Number of Shares | Purchase Price Per Share | Total Cost (not including brokerage commission) |
|---|---|---|---|
| 3/28/80 | 5,000 | 9 ⅛ | $ 47,500.00 |
| 3/31/80 | 500 | 9 ⅜ | 4,687.50 |
| 4/01/80 | 1,400 | 9 ¼ | 12,950.00 |
| 4/03/80 | 500 | 9 ⅜ | 4,687.50 |
| 4/03/80 | 100 | 9 ¼ | 925.00 |
| 4/07/80 | 64,000 | 10 ½ | 672,000.00 |
| 4/07/80 | 100 | 9 ¼ | 925.00 |
| 4/10/80 | 4,100 | 10 ¼ | 42,025.00 |
| TOTAL | 75,700 shares | | $785,700.00 aggregate cost |

The average price paid by Walco for these shares was $10.38 per share.

The brokerage commissions paid by Walco in its purchases of the 75,700 shares amounted to $5,342.

Walco contends that it incurred legal expense of approximately $42,000 in connection with its acquisition of the 75,700 shares and that these fees should be considered in arriving at its profit. Its contention is based upon the fact that it resisted legal action by Reece in which Reece was attempting to prevent Walco from buying shares. Walco has attempted to apportion the cost of this litigation and allocate part of it to the 75,700 shares. The amount arrived at is approximately $42,000.

With regard to the sale price, on April 29–30 Walco's entire block of Reece's stock was sold. As described in the September 17, 1981 opinion, the parties purported to break the sale transaction into two stages—a sale of 143,275 shares for $8.75 per share on April 29 and a sale of 273,025 shares on April 30 for $13.71. This Court held that the April 29 and April 30 "sales" constituted in fact a single sale at an agreed price of $12 per share. The sale price of the 75,700 shares, at $12 per share, was $908,400.

* In the September 17, 1981 opinion, it was stated that a purchase by Walco of 5,100 shares on March 27, 1980 put Walco's holdings slightly over the 10% mark, the total Walco purchases as of that date amounting to 285,600 shares. In fact, the latter number of shares was slightly less than 10%, since the total outstanding was 2,873,655. It was not until March 28, with the 55,000 share purchase, that Walco actually owned more than 10% of the Reece stock.

Walco contends that part of the price Reece paid in the April 29–30 transaction was in payment for certain covenants given by Walco to Reece. Walco argues that this circumstance reduces or eliminates any profit related to the sale of the stock itself. The covenants were that Walco would forgo the acquisition of any further Reece stock or the solicitation of any proxies from Reece stockholders. Walco agreed to take no action which might affect the control of Reece or the management of the company by way of tender offer, exchange offer or otherwise. These covenants were for a period of seven years.

There were two "agreements" dealing with the sale by Walco to Reece—one dated April 29, 1980 and the second dated April 30, 1980. The April 29 agreement does not contain any of the covenants, but simply reflects the sale of a portion of the shares and the price ascribed to those shares ($1,253,656), which was equal to $8.75 per share. The April 30 agreement contains the Walco covenants. However, the sale price ($3,741,944) is designated as relating solely to the shares, as shown by the following provision in that agreement:

"1. *Purchase and Sale.*

Subject to the terms and conditions of this Agreement, Walco hereby transfers, sells and delivers to Reece, and Reece hereby purchases from Walco, the Stock for an aggregate price of $3,741,944.00 cash ('Purchase Price')."

This price was equal to the $13.71 unit price. The April 30 agreement does not attempt to assign any price or value to the restrictive covenants.

However, Walco argues that Reece, on its books, treated part of the amount paid in the April 29–30 transaction as relating to the covenants, and contends that the Court should apply the same treatment. Reece calculated the average market value of the shares on the New York Stock Exchange on April 29 and April 30 as $9.21 or $9.23 per share (there is a slight confusion in the calculations). Reece considered that the total NYSE market value of the 416,300 shares on April 29 and 30 was $3,834,556.

The total price received for the 416,300 shares in the April 29–30 transaction was $4,995,600 (average $12 per share). The difference between the $4,995,600 and the $3,834,556 is $1,161,044. On its books, (as reflected in its annual report and other documents) Reece treated the $3,834,556 as payment for the shares and the $1,161,044 as the value of the covenants.

In an internal summary of the transaction, Reece stated that for tax purposes the "premium" of $1,161,044 was to be amortized over the seven-year life of the covenants.

No evidence was introduced as to how Walco treated the transaction on its books.

### Conclusions

Section 16(b) relates, among other things, to a person who is the beneficial owner of more than 10% of a class of equity security (*see* 15 U.S.C. § 78p(a)), and provides:

"(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, . . . any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security . . . within any period of less than six months . . . shall enure to and be recoverable by the issuer. . . . This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved. . . ." 15 U.S.C. § 78p(b).

The first issue which should be resolved is Walco's contention about the covenants. If Walco is correct, it is entitled to apportion the amount of the April 29–30 transaction in the way Reece has done on its books, and to have the price for the stock (as distinct from the "price" for the covenants) be deemed to be $9.21 or $9.23 per share. The result would be to entirely wipe out any claim that Walco sold these shares at a profit. The average cost to Walco of the 75,700 shares was $10.38 per share (before brokerage). If Walco sold the shares to Reece for $9.21 or $9.23 per share, Walco took a loss.

■ However, the Court cannot accept Walco's position. In the first place, treatment of a transaction by a party such as Reece for tax purposes is not binding or controlling on the question of § 16(b) recovery. *Morales v. Consolidated Oil & Gas, Inc.,* [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,796 (S.D.N.Y.1982); *Schur v. Salzman,* 365 F.Supp. 725, 730 (S.D.N.Y. 1973); *Blau v. Mission Corp.,* 212 F.2d 77, 80 (2d Cir.), *cert. denied,* 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954).

■ For the purpose of applying § 16(b), it should be noted that no value was assigned to the covenants in the April 29–30 agreements between Reece and Walco. Moreover, the Walco argument about apportionment of the price is inconsistent with the policy underlying the statute. The decision in *Schur v. Salzman,* cited above, is in point. The defendant in that case argued that there were no recoverable profits under § 16(b) because the premium he had received over the value on the open market was attributable, among other things, to his resignation as an officer and director of the issuing company, and the cancellation of his employment contract. Judge Weinfeld rejected the defendant's "attempt to fragmentize the purchase price by allocating various amounts to items other than the shares." The judge noted that the purpose of the statute was to "squeeze all possible profits" out of stock transactions coming within its scope, and that to permit the kind of allocation suggested by the defendant would "create a host of problems that would tend to weaken rather than enforce the strict insider's liability contemplated by section 16(b)." 365 F.Supp. at 731.

Accordingly, in the present case, the Court declines to allocate any part of the price received by Walco to the covenants, as distinct from the stock.

With this issue resolved, the calculation of Walco's profit is quite simple. We start with the actual price paid by Walco for the 75,700 shares ($785,700). As to the price received by Walco in the April 29–30 transaction, there is no reason to depart from the figure of $12 per share, referred to earlier,

or the total of $908,400. Subtracting the $785,700 from the $908,400 gives $122,700.

Reece argues for certain different methods of calculation which would yield higher profit figures. Reece contends that Walco's purchase prices should be based on certain different and earlier stock purchases—other than the actual purchases of the 75,700 shares. Also, Reece argues that the figure for the price received by Walco should be the $13.71 price assigned to the April 30 shares, rather than the $12 average for all the shares involved in the April 29–30 transaction. Reece relies on *Smolowe v. Delendo Corp.,* 136 F.2d 231 (2d Cir.1943), *cert. denied,* 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1944), and *Gratz v. Claughton,* 187 F.2d 46 (2d Cir.), *cert. denied,* 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951).

Reece's position is entirely without merit. The methods of calculating § 16(b) damages discussed in the *Smolowe* and *Gratz* cases are designed to deal with completely different problems from those in the present case, and have no application here.

Reece's contention that it is entitled to include certain dividends in the damage figure is also without merit. No dividends were paid on the 75,700 shares.

Walco contends that its brokerage commissions ($5,342) on the purchases of the 75,700 shares, and the legal fees ($42,000) incurred in litigation regarding its stock purchases should be deducted in arriving at its profits.

The brokerage commission of $5,342 is a proper deduction. *Sprague Electric Co. v. Mostek Corp.,* 488 F.Supp. 842, 846 (N.D. Tex.1980). The legal expenses are not. *See Lane Bryant, Inc. v. Hatleigh Corp.,* 517 F.Supp. 1196 (S.D.N.Y.1981).

Accordingly, the $5,342 will be deducted from the $122,700, resulting in a net profit figure of $117,358.

Reece seeks an award of pre-judgment interest. In the exercise of discretion, this request is declined. *See Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962); *Blau v. Lamb,* 242 F.Supp. 151, 161 (S.D.N.Y.1965).

Reece is entitled to judgment in the amount of $117,358.

Settle judgment.